**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
Aatif Iqbal
600 Third Avenue, 20th Floor
New York, New York 10016
Phone: 212-661-1100
jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: 312-377-1181
Email: pdahlstrom@pomlaw.com

**CHRISTENSEN YOUNG & ASSOCIATES, PLLC**
Zane L. Christensen (USB 14614)
Steven A. Christensen (USB 5190)
9980 South 300 West, Ste 200
Sandy, UT 84070
Phone: 801-676-6447
Email: zane@christensenyounglaw.com
steven@christensenyounglaw.com

*Attorneys for Zhang Lead Plaintiffs*

---

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| IN RE LIFEVANTAGE CORPORATION SECURITIES LITIGATION | Case No. 2:16-cv-00965-TS <br> **AMENDED CLASS ACTION COMPLAINT** <br> CLASS ACTION <br> JURY DEMANDED |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 4

PARTIES ............................................................................................................................. 4

FORMER EMPLOYEES ...................................................................................................... 6

SUBSTANTIVE ALLEGATIONS ....................................................................................... 7

    Background ................................................................................................................ 7

    MLMs and Pyramid Schemes ................................................................................. 8

    New Management in 2015 ...................................................................................... 13

    The Company's Turnaround Plan ........................................................................... 16

    The Company's New Incentives Encourage Improper Sales Practices ................ 18

    LifeVantage's Inadequate Internal Controls .......................................................... 22

    The Truth Emerges ................................................................................................. 27

MATERIALLY FALSE AND MISLEADING STATEMENTS ...................................... 39

SCIENTER ......................................................................................................................... 46

CLASS-ACTION ALLEGATIONS .................................................................................. 49

COUNT I ............................................................................................................................ 52

COUNT II .......................................................................................................................... 56

PRAYER FOR RELIEF .................................................................................................... 57

DEMAND FOR TRIAL BY JURY .................................................................................. 57

Plaintiffs Dale Blanch and Yvonne Cohen ("Zhang Lead Plaintiffs"), on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of SEC filings by LifeVantage Corporation ("LifeVantage" or the "Company"), press releases and other public statements by Defendants, media and analyst reports and advisories about the Company, interviews with confidential witnesses, and other publicly available information. Zhang Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired LifeVantage securities between September 1, 2015 and January 18, 2017, both dates inclusive (the "Class Period"), seeking remedies against SuperCom and certain senior officers under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5.

2.      Defendant LifeVantage sells nutritional supplements and skin care products in the United States, Japan, Hong Kong, Australia, Canada, Philippines, Mexico, and Thailand. Its flagship product is a "scientifically-validated dietary supplement" called Protandim. It also sells TrueScience anti-aging skin care products, Canine Health pet supplements, Axio energy drink mixes, and PhysIQ weight management products.

3.      Since 2009, LifeVantage has used a "network marketing" or "direct selling" business model, also known as multi-level marketing ("MLM"). Instead of selling its products in

retail stores or employing its own sales personnel, LifeVantage relies on "independent distributors" both to sell its products and to recruit additional distributors.

4.     During the Class Period, the Defendants represented that the Company's internal controls were sound and adequate, and that they monitored and "systematically" reviewed potential misbehavior by their independent distributors through the Company's internal compliance department. In truth, the Company lacked fundamental internal controls over its international distributors and its compliance with applicable laws and regulations. As the Company ultimately admitted, as a result of its deficient internal controls, the Company:

(a)     "sold…products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model";

(b)     "allowed individuals who were resident in countries that impose stringent restrictions on our direct selling model to enroll as independent distributors"; and

(c)     "did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance that such distribution of our products complied with applicable customs, tax and other regulatory requirements."

5.     The truth was revealed to the market in a series of corrective disclosures.

6.     On September 13, 2016, post-market, LifeVantage issued a press release and filed a Current Report on Form 8-K announcing a delay in the release of the Company's fourth quarter and fiscal year 2016 financial results. The Form 8-K revealed that the delay was due to

2

the fact that the Company was "in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales." On this news, LifeVantage stock fell $1.32, or 12.69%, to close at $9.08 on September 14, 2016.

7.      On November 10, 2016 (after market close), LifeVantage filed a Notification of Late Filing on Form 12b-25 stating that it was still unable to file its quarterly report for the quarter ended September 30, 2016 because its investigation was still ongoing. On this news, LifeVantage stock fell $0.49, or 5.11%, to close at $9.10 on November 11, 2016.

8.      On December 12, 2016, after market close, the Company finally filed its Form 10-K for the fiscal year ended June 30, 2016 (the "2016 10-K") and its Form 10-Q for the quarterly period ended September 30, 2016 (the "2017 Q1 10-Q"), disclosing that its investigation had uncovered the aforementioned improper sales practices, and further, that it had uncovered numerous internal control deficiencies in the Company that had facilitated the misconduct, and that the Company would need to undertake remedial measures to fix its internal controls. Defendants further revealed that the Company's because of the necessary revisions to its internal controls, "revenue in future periods from sales of our products that are carried or shipped into these countries will be significantly lower than fiscal 2016."

9.      On this news, LifeVantage stock fell $1.02, or 10.53%, to close at $8.67 on December 13, 2016. The next day, it fell $0.32, or 3.69%, to close at $8.35 on December 14, 2016.

10.      On December 15, 2016, the Company disclosed that it had terminated its Chief Operating Officer, Robert Urban.

11.     On January 18, 2017, after market close, the Company disclosed that it had terminated Defendant Jaggi, the Company's CFO, and had undertaken a search for a new permanent CFO. On this news, LifeVantage stock fell $0.39, or 5.16%, to close at $7.17 on January 19, 2017.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Zhang Lead Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter under 28 U.S.C. §§ 1331 and 1337, and section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District under section 27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant LifeVantage is headquartered within this District.

15.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

16.     Zhang Lead Plaintiffs purchased LifeVantage securities at artificially inflated prices during the Class Period and were damaged thereby.

17.     Defendant LifeVantage is incorporated in Colorado, with principal executive offices at 9785 South Monroe Street, Suite 300, Sandy, Utah 84070. Its common stock trades on the NASDAQ under the ticker symbol "LFVN."

18.     Defendant Darren Jay Jensen has served as the Company's director since January 2016 and as Chief Executive Officer and President since May 18, 2015. The Company's January 4, 2017 Proxy Statement stated the following about Jensen:

> Mr. Jensen was appointed as our President and Chief Executive Officer in May 2015. He was appointed to our board of directors in January 2016 by the board of directors and has not previously been up for election at an annual meeting of shareholders. From June 2014 to May 2015, Mr. Jensen served as the President-Americas and from September 2012 to June 2014 as the Chief Sales Officer at Jeunesse Global, a privately-held direct selling anti-aging and skin care company. Prior to joining Jeunesse Global, Mr. Jensen served from August 2011 to June 2012 as the Chief Sales Officer of Ampegy, a privately-held direct selling company in the energy industry. Prior to that, he was the Executive Vice President and Corporate General Manager at Agel Enterprises, a nutritional supplements direct selling company, where he was also a Co-Founder of the Agel Cares Foundation. From 2003 to 2005, Mr. Jensen was the Director of International Business Development at USANA Inc. Mr. Jensen served as a Brand Manager at Amway Global from 1995 to 1997. Mr. Jensen began his direct selling career at Nu Skin Enterprises in Provo, where he served as an International Marketing Specialist from 1990-1995. Mr. Jensen received a bachelor of arts degree from Brigham Young University. Mr. Jensen's more than 25 years of experience in the direct selling industry brings to our board of directors deep industry expertise as well as strong leadership in all aspects of our business.

19.     Defendant Mark R. Jaggi served as the Company's Chief Financial Officer and Treasurer from August 24, 2015 until his termination on January 18, 2017. The Company's January 4, 2017 Proxy Statement stated the following about Jaggi:

Mr. Jaggi was appointed our Chief Financial Officer and Treasurer in August 2015. From March 2012 to August 2015, Mr. Jaggi was the Executive Vice President, Treasurer and Chief Financial Officer of Twinlab Consolidated Holdings Inc., a publicly traded nutritional supplements and natural products company. Prior to joining Twinlab Consolidated Holdings Mr. Jaggi was with Summit Industries, a manufacturer and marketer of pharmaceutical and non-regulated liquid and cream solutions, as its President and Chief Executive Officer from 2009 until March 2012 and as its Chief Financial Officer from 2007 to 2009. Prior to Summit Industries, Mr. Jaggi served as Director of Finance at O'Sullivan Industries from 2005 to 2007 and held positions of increasing responsibility at Ford Motor Company from 1998 to 2005. Mr. Jaggi holds a bachelor's degree in Finance from the University of Utah and an MBA from Duke University.

20.     Jensen and Jaggi are sometimes referred to herein as the "Individual Defendants."

## **FORMER EMPLOYEES**

21.     Former Employee 1 ("FE 1") served as Managing Director of LifeVantage's Japan business from June 2014 until June 2016. FE 1 had been recruited by LifeVantage's former CEO Doug Robinson to restore order to a fractured market that was rife with infighting among the Company's distributors.

22.     Former Employee 2 ("FE 2") served as the Company's Director of Recognition & Incentives from February 2009 to February 2016. FE 2 oversaw the Company's distributor recognition programs and was responsible for incentive trips, retreats, and training events.

23.     Former Employee 3 ("FE 3") served as Senior VP of Global Sales and Business Development from January 2009 to November 2015. FE 3 oversaw all international business development and remained in close contact with the Company's top distributors.

24.     Former Employee 4 ("FE 4") served as VP of Marketing from June 2014 to June 2015.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     LifeVantage sells nutritional supplements and skin care products in the United States, Japan, Hong Kong, Australia, Canada, Philippines, Mexico, and Thailand. Its flagship product is a "scientifically-validated dietary supplement" called Protandim. It also sells TrueScience anti-aging skin care products, Canine Health pet supplements, Axio energy drink mixes, and PhysIQ weight management products.

26.     Since 2009, LifeVantage has used a "network marketing" or "direct selling" business model, also known as multi-level marketing ("MLM"). Instead of selling its products in retail stores or employing its own sales personnel, LifeVantage relies on "independent distributors" both to sell its products and to recruit additional distributors.

27.     According to LifeVantage's Form 10-K for the fiscal year ended June 30, 2015 (the "2015 10-K")[1], an "independent distributor" is "someone who participates in our network marketing business opportunity by purchasing our products at wholesale prices and selling our products to others." Likewise, "active independent distributors" are defined as "independent distributors who have purchased product from us for retail or personal consumption during the prior three months."

28.     According the 2015 10-K, LifeVantage distributors are compensated as follows:

---

[1] LifeVantage's fiscal year ends on June 30.

An independent distributor creates **multiple levels of compensation by selling our products and enrolling new independent distributors who sell our products**. These **newly enrolled independent distributors form a "downline" for the independent distributor** who enrolled them. If downline independent distributors enroll new independent distributors who purchase our products, they create additional levels of compensation and their downline independent distributors remain in the same downline network as the original enrolling independent distributor. We pay commissions only upon the sale of our products. We do not pay commissions for enrolling independent distributors.

29.     The 2015 10-K further elaborates:

Our independent distributors earn compensation on their product sales and product sales made by independent distributors within their sales organization, or "downline." Our independent distributors can also earn money by purchasing product from us at our wholesale cost and selling that product to others at the retail cost.

30.     Under this compensation system, distributors are incentivized both (1) to sell products directly through personal relationships and word-of-mouth marketing and (2) to recruit and train their "downline" organization.

**MLMs and Pyramid Schemes**

31.     However, the more strongly distributors are incentivized simply to recruit other distributors—as opposed to being incentivized primarily to generate retail sales to customers outside the organization—the more an MLM starts to resemble a pyramid scheme. This makes it essential for any MLM business to stay on the right side of the line and to implement controls capable of providing reasonable assurance that it remains there.

32.     As the Sixth Circuit has explained, "No clear line separates illegal pyramid schemes from legitimate multilevel marketing programs." *U.S. v. Gold Unlimited, Inc.*, 177 F.3d 472, 475 (6th Cir. 1999).

8

33.   The FTC's website explains the difference as follows:

In multilevel or network marketing, individuals sell products to the public—often by word of mouth and direct sales. Typically, distributors earn commissions, not only for their own sales, but also for sales made by the people they recruit.

Not all multilevel marketing plans are legitimate. ***If the money you make is based your sales to the public, it may be a legitimate multilevel marketing plan. If the money you make is based on the number of people you recruit and your sales to them, it's probably not***. It could be a pyramid scheme. Pyramid schemes are illegal, and the vast majority of participants lose money.[2]

34.   The Director of the SEC Division of Enforcement explained the difference

similarly:

A legitimate MLM program involves ***selling a genuine product or service to people who are not in the program***. Participants get compensated based on the products or services that they, or the distributors that they recruited, sell to others. However, ***some MLM programs are actually pyramid schemes, in which participants profit not from the product they are selling but almost exclusively through recruiting other people to participate*** in the program.[3]

35.   The FTC has also described certain indicia of a pyramid scheme:

Some schemes may purport to sell a product, but they often simply use the product to hide their pyramid structure. There are two ***tell-tale signs that a product is simply being used to disguise a pyramid scheme: inventory loading and a lack of retail sales***. Inventory loading occurs when a

---

[2] FTC, "Multilevel Marketing," https://www.ftc.gov/tips-advice/business-center/guidance/multilevel-marketing (last visited Jan. 27, 2017).

[3] Andrews Ceresney, Director, SEC Division of Enforcement, *UIC-SEC Joint Symposium to Raise Public Awareness: Combating Pyramid Schemes and Affinity Frauds Opening Remarks* (Mar. 2, 2016), https://www.sec.gov/news/speech/ceresney-remarks-joint-symposium-raise-public-awareness-03022016.html.

company's ***incentive program forces recruits to buy more products than they could ever sell***, often at inflated prices. If this occurs throughout the company's distribution system, the people at the top of the pyramid reap substantial profits, even though little or no product moves to market. The people at the bottom make excessive payments for inventory that simply accumulates in their basements. A lack of retail sales is also a red flag that a pyramid exists. Many pyramid schemes will claim that their product is selling like hot cakes. However, on closer examination, the ***sales occur only between people inside the pyramid structure or to new recruits joining the structure, not to consumers out in the general public***.[4]

36.     The FTC further defined these standards in 1979, when it held that Amway was not a pyramid scheme because it had three policies that served to encourage retail sales and prevent inventory loading by distributors: (1) participants were required to buy back from any person they recruited any saleable, unsold inventory upon the recruit's leaving Amway (the "Buyback Policy"), (2) every participant was required to sell at wholesale or retail at least 70% of the products bought in a given month in order to receive a bonus for that month (the "70% Rule"), and (3) in order to receive a bonus in a month, each participant was required to submit proof of retail sales made to ten different consumers (the "10 Customer Rule"). *In re Amway Corp.*, 93 F.T.C. 618, 715–16 (1979).

37.     However, the mere existence and enforcement of such rules "is only the first step in the pyramid scheme inquiry"—there must also be "evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales." *Webster v. Omnitrition Int'l*, 79 F.3d 776, 783 (9th Cir. 1996). For example, the 70% Rule and 10 Customer

---

[4] Debra A. Valentine, Former General Counsel, FTC, *Pyramid Schemes* (May 13, 1998), https://www.ftc.gov/public-statements/1998/05/pyramid-schemes.

Rule are meaningless if commissions are paid based on a distributor's wholesale purchases (which, at best, reflect sales to new recruits), rather than on actual retail sales. *Id.*

38.     Accordingly, it is essential for any MLM business to keep track of the ratio of internal sales to external sales. If product sales are overwhelmingly to "people inside the pyramid structure or to new recruits joining the structure," those sales are more likely to be incidental to recruiting additional individuals to join the network, rather than reflective of any true retail demand for the company's products. "That structure, which focuses on recruitment of people, not products, inevitably causes the scheme to collapse when participants run out of individuals to recruit and there are no more new recruits to pay those higher up the pyramid." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639 (5th Cir. 2016).

39.     Over the past few years, controversies in the US concerning MLMs have only intensified, particularly with respect to Herbalife, one of the largest MLM firms. For example, in December 2012, William Ackman argued in a detailed presentation that Herbalife was a pyramid scheme and announced that his hedge fund, Pershing Square Capital, had taken a $1 billion short position. Several lawsuits followed, the issue also drew Congressional attention, and the FTC formally began investigating. On July 15, 2016, Herbalife reached a settlement with the FTC that required it to pay $200 million and to enter a consent decree requiring significant changes to its compensation system and business model.[5] As an article in *Fortune* explained:

> Under the decree, Herbalife's distributors will not only be required to keep
> records of their retail sales (which they were already supposed to be doing
> under internal rules) but to produce those records to Herbalife. Herbalife,
> in turn, is not supposed to pay full commissions to distributors unless

---

[5] Stipulation to Entry of Order for Permanent Injunction and Monetary Judgment, *FTC v. Herbalife Int'l*, No. 2:16-cv-05217 (C.D. Cal. July 15, 2016), ECF No. 3.

distributors nationwide provide documentation for 80% of their retail sales. Distributors can get credit for a certain number of purchases attributable to their and their recruits' own personal consumption, but at least two-thirds of the compensable purchases have to be resold to retail customers. Retail customers can either be people unaffiliated with Herbalife or they can be "Herbalife preferred customers," a new category of Herbalife member created by the decree who join only to qualify for discounts but not to make money from commissions.

"The FTC-Herbalife settlement is a remarkable document," says Douglas Brooks, a plaintiffs lawyer who has brought numerous class action suits against MLMs, including Herbalife, Nu Skin, and Omnitrition. "It represents the ultimate enforcement of the requirement that ***rewards to participants in a multi-level marketing compensation system must be based on bona fide retail sales***." [6]

40.     Similar controversies have taken place outside the United States as well. For example, in August 2012, Citron Research released a report accusing Nu Skin Enterprises, a large MLM company, of operating an illegal pyramid scheme in China. On January 16, 2014, Chinese regulators announced an investigation into Nu Skin for operating an illegal pyramid scheme in China.[7] Over the next few days, Nu Skin stock fell over 43%; and shares of Herbalife and Usana (another publicly traded MLM with operations in China) also dropped sharply.

---

[6] Roger Parloff, *Herbalife Deal Poses Challenges For The Industry*, Fortune, Jul 19. 2016, http://fortune.com/2016/07/19/herbalife-deal-challenges-industry/.

[7] *Skincare products maker Nu Skin settles class action suit*, Reuters, Feb. 26, 2016, http://www.reuters.com/article/us-nu-skin-enter-settlement-idUSKCN0VZ25H; *Nu Skin Shares Drop Sharply on China Probe; Communist Party Paper Alleges U.S. Company Is Operating Pyramid Scheme*, Wall St. J., Jan. 16, 2014, http://www.wsj.com/articles/SB10001424052702303465004579323840382392148; *Nu Skin Shares Gain on Speculation That Chinese Probe Is Easing*, Bloomberg News, Mar. 24, 2014, https://www.bloomberg.com/news/articles/2014-03-24/china-fines-nu-skin-540-000-for-illegal-sales-and-product-claim.

41.     There is also evidence of numerous Herbalife distributors selling into countries where Herbalife lacked licenses or other legal authorization to sell, raising "uncertainties about Herbalife's compliance with customs, tax and health regulations around the world."[8]

## New Management in 2015

42.     In November 2012, LifeVantage's then-CEO, Douglas C. Robinson, claimed the shift to an MLM business model "saved (the) company."[9] Indeed, LifeVantage grew rapidly for several years after 2009. However, tensions among the Company's distributors worsened over time, resulting in the termination of numerous distributors and a number of high-profile lawsuits.[10]

43.     By 2014, the Company's growth had leveled off and then began to decline. The table below shows the Company's revenue per fiscal year:

| Fiscal Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Revenues (in millions) | $4.14 | $11.48 | $38.92 | $126.18 | $208.18 | $213.97 | $190.34 |

---

[8] Christine Richard, *Are Investors Underestimating The Risks To Herbalife's International Business?*, Seeking Alpha (Dec. 20, 2016), http://seekingalpha.com/article/4031549-investors-underestimating-risks-herbalifes-international-business.

[9] Hank Schultz, *LifeVantage's shift to network marketing saved company, CEO says*, Nutraingredients-USA, Nov. 19, 2012, http://www.nutraingredients-usa.com/Manufacturers/LifeVantage-s-shift-to-network-marketing-saved-company-CEO-says.

[10] *See, e.g., LifeVantage Corp. v. Jackson*, No. 2:12-cv-01003-TS (D. Utah Oct. 26, 2012); *LifeVantage v. Domingo*, No. 2:13-cv-01037-JNP (D. Utah Nov. 19, 2013).

44.     The revenue decline in 2015 was particularly severe in Japan. According to the 2016 10-K, the Company generated $62 million from Japan in FY 2014, but only $42 million in FY 2015 and $36 million in FY 2016.

45.     FE 1, who served as Managing Director of LifeVantage's Japan business from June 2014 until June 2016, explained that the decline in Japan was due to intense turmoil among the Company's distributors, who had organized into two factions aligned with each of the country's top two distributors. Eventually, both top distributors had to be terminated, along with many of their supporters, which led to sharp decline in sales volume.

46.     The Company tried to address the decline by installing a whole new management team. In 2015, nearly all of the Company's top management either resigned or was terminated, including the President and Chief Executive Officer, Chief Financial Officer, Chief Sales Officer, Chief Science Officer, and the General Counsel.

47.     On February 2, 2015, the Company issued a press release announcing that the Board and CEO Douglas C. Robinson had "mutually agreed that Mr. Robinson will step down from his role as President, Chief Executive Officer and Board Member, effective immediately" and that a search committee had been formed to find a replacement. Meanwhile, the Board had appointed Dave S. Manovich as Executive Vice Chairman and formed an "interim Office of the President" composed of "the Company's senior operational officers: Shawn Talbott. Ph.D, Chief Science Officer, David Phelps, Chief Sales Officer, David Colbert, Chief Financial Officer, and Robert Urban, Chief Operating Officer."

48.     On February 4, 2015, Garry Mauro, Chairman of the Board, explained in a conference call why the Board found it necessary to replace the CEO:

14

The Board believes this change in our management is necessary as our *growth has reached a plateau*. The Company is not progressing in line with our business model of a growth-oriented, science-based network marketing company. The intent of this move is to one, deliver consistent, predictable growth; two, to better ensure the success of our outstanding distributor sales force; three, successfully manage the complexities of international product distribution and finance; four, further the validation of our science-based products and finally, address the needs of our customers.

49.     On April 29, 2015, the Company announced in a press release and Form 8-K that Darren Jensen had been named President and Chief Executive Officer, effective May 18, 2015.

50.     On May 5, 2015, the Company announced in a Form 8-K that it had "determined to eliminate the position of General Counsel" and that "the employment of Robert H. Cutler, our General Counsel and corporate Secretary was terminated effective May 8, 2015."

51.     On July 2, 2015, the Company announced in a Form 8-K that it had "terminated the employment of David Colbert, our Chief Financial Officer and Treasurer." On August 24, 2015, it announced that Defendant Jaggi had been appointed Chief Financial Officer and Treasurer.

52.     On July 22, 2015, LifeVantage announced in a press release that it had appointed Justin Rose as Chief Science Officer.

53.     In November 2015, LifeVantage appointed Ryan Goodwin as Chief Marketing Officer.

54.     Even the Company's auditor did not remain in place. On April 13, 2016, LifeVantage issued a press release, announcing that "the Audit Committee of its Board of Directors has engaged BDO USA, LLP as its new independent auditor, effective April 12, 2016." But then on July 13, 2016, LifeVantage issued a press release announcing that the Audit

Committee of the Board of Directors had "dismissed BDO USA, LLP as the Company's auditor due to BDO's determination that it was not independent of the Company with respect to the fiscal year ended June 30, 2016" and that WSRP, LLC had been engaged as the Company's new independent auditor.

55.     As the 2016 10-K later acknowledged, all of this turnover was likely "a contributing factor to the material weakness in our internal control over financial reporting related to our business policies, practices, monitoring and training governing our international business operations."

### The Company's Turnaround Plan

56.     To turn the Company around, Jensen developed an "eight-point plan," which he explained in a conference call on September 1, 2015.

57.     The second of those points was "enhancements to our business model designed to modify the purchasing habits of our existing distributor base." This included "simplifying our enrollment options and the process by which new distributors enter the business" as well as creating "additional incentives which created compelling business reasons to join with our most advantageous package." Jensen's rationale was that, in his experience, "distributors who make a greater commitment at the time of enrollment tend to stay with the company longer and are overall more engaged with building their businesses."

58.     The third point was "to incentivize our distributors to achieve higher monthly sales production" by creating a "new bonus pool" for "distributors who join with our largest enrollment package and then sell approximately $5,000 per month of product."

59.     The fourth point was to incentivize and encourage "both new and existing distributors to shorten the time it takes for them to build large sales organizations and advance to our key leadership ranks." This would "create[] a sense of urgency for people to accelerate their rank advancement" while creating a particularly "significant incentive for our new distributors to achieve the important rank of Pro 5," which "serves as the basic building block of leadership in our compensation plan."

60.     The seventh point was "to implement programs and strategies to attract new leaders to our distributor team." In particular, the Company had rolled out a program called "the Red Carpet Experience" to recruit "distributor leader[s]" with "proven track record[s]" from other direct selling companies. Jensen "anticipate[d] that as time progresses, this will be a major factor in attracting strong field leadership to our Company."

61.     Jensen emphasized the seventh point even more heavily on the November 4, 2015 call, when he touted the success of the Company's red carpet events and described his efforts to attract new leaders, including through red carpet events, as central to the Company's strategy for improving its prospects in Japan:

> [T]he *key part of the growth in any market and including Japan is field leadership*. Basically, what I found over the last 26 years is that *one leader…can change the course of the country*. And we have many good leaders that are there in Japan, and we're working with them to re-engage them and to energize them in building their business because we have great leadership already. And many of the programs that I just announced, like the red carpet program, the Pro5 accelerator, the platinum packages, those are *all designed to make us more attractive to leadership outside of the company to bring them in because we always need more leadership*. And the better and the more field leadership that we have the faster will get a turnaround in that country.

62.     The eighth point was expanding globally by "***targeting certain gateway markets*** which in turn opens up opportunities in more and more markets in any given region."

**<u>The Company's New Incentives Encourage Improper Sales Practices</u>**

63.     However, many of these changes created problematic incentives, which overly encouraged rapid recruitment at the expense of retail sales (thus increasing all the risks associated with pyramid schemes) as well as the improper sales practices later disclosed in the 2016 10-K.

64.     The website *Behind MLM* explained many of these problematic incentives in a December 8, 2015 post, which summarized "the core problem of LifeVantage's MLM opportunity" as follows:

> ***Affiliates are forced to purchase product each month just to qualify for commissions, with this overriding any arguments about affiliates purchasing the product for any other reason***.
>
> ***The compensation plan itself then lends itself to affiliate autoship recruitment***, with this guaranteed because *every* affiliate *must* have a standing autoship order to qualify for commissions.
>
> Additional incentives pushing autoship recruitment include the bumping of the Fast Start Bonus to 40% with a 200 PV a month autoship order and the Matching Residual Bonus.
>
> Given the autoship focus, it's likely that most LifeVantage affiliates will qualify for the full bonus by having a 200 PV a month autoship order.
>
> The bonus itself meanwhile is also likely to be mostly paid out volume-wise on autoship orders by recruited affiliates.
>
> The ***affiliate packs also delve into pay-to-play territory***, with the more an affiliate spending on the pack equating to higher commission rates.

These commissions are paid out when recruited affiliates purchase the packs, with them essentially serving as high-priced recruitment aids.

Again the products bundled with the packs are designated irrelevant, because there's a direct financial incentive attached to each pack purchase.

Worse still, those who order the cheaper packs are punished with the halving of commissions when recruited affiliates purchase the more expensive packs.

***Perhaps the most alarming aspect of LifeVantage's compensation plan documentation however was the complete absence of retail commission information***.

As it stands ***it is unclear whether LifeVantage pay commissions on retail orders*** (preferred customers orders are paid out residually through the unilevel).

One possibility is that retail orders pay out through the unilevel, which would equate to a 2% commission per order.

This is in line with LifeVantage's otherwise complete lack of focus on retail sales, but I can't say whether it's the case for sure.

Either way, ***the fact that LifeVantage's compensation plan doesn't mention retail sales speaks volumes***.[11]

65.     Many of Jensen's new bonus pools and other incentives only made these problems worse.

66.     According to FE 2,[12] distributors qualified for many of these incentives based not on their retail sales, but rather on their "organizational volume." For example, even today,

---

[11] *LifeVantage Review: No retail focus & mandatory autoship*, BehindMLM.com, Dec. 8, 2015, http://behindmlm.com/mlm-reviews/lifevantage-review-no-retail-focus-mandatory-autoship/.

[12] FE 2, who served as the Company's Director of Recognition & Incentives from February 2009 to February 2016, oversaw the Company's distributor recognition programs and was responsible

LifeVantage's website advertises an opportunity to "Grow your Organizational Volume over the next 5 months to earn your way to Hawaii."[13] In LifeVantage's Compensation Plan, "organizational volume" is defined as "[t]he amount of product **consumed** or sold **by a distributor's entire downline organization**"—which includes the distributor's own "personal volume," which is defined as "[t]he amount of product personally **consumed** or sold **by a distributor** and/or their preferred customers."[14]

67.     This means distributors can qualify for such trips simply by making large purchases for personal use and by recruiting a downline that also makes large purchases— regardless of whether this results in any actual retail sales. This encourages "inventory loading," which "occurs when distributors make the minimum required purchases to receive recruitment-based bonuses without reselling the products to consumers." *Webster v. Omnitrition Int'l*, 79

---

for incentive trips, retreats, and training events.

[13] LifeVantage Hawaii '17, https://www.lifevantage.com/upcoming-events/hawaii-promotion-2017/ (last visited Jan. 27, 2017).

[14] LifeVantage Compensation Plan at 7, available at http://www.thedoortohealthandwealth.com/docs/CompensationPlanBrochure.pdf (last visited Jan. 27, 2017); *accord* LifeVantage Compensation Plan at 5, available at https://th-en.lifevantage.com/wp-content/uploads/sites/11/2013/06/th-comp-plan-en-march2015.pdf.

*See also* LifeVantage Compensation Plan Highlights, available at https://www.lifevantage.com/wp-content/uploads/2013/06/US-Compensation-Plan-Highlights-Flyer-V.04.pdf (PV "may come from Preferred Customers, Retail Sales, and Personal Product Purchases"); LifeVantage USA Policies and Procedures (Apr. 1, 2015), at 11.1.1 – Sales Volume ("PV includes purchases made by the Independent Distributor and Direct Retail Customers" and "OV shall include the total PV of all Independent Distributors in his or her Marketing Organization plus the Independent Distributor's PV").

20

F.3d 776, 783 n.3 (9th Cir. 1996). And inventory loading is one of the primary indicia of a pyramid scheme.

68.     FE 4 confirmed that inventory loading was a major problem, especially in Hong Kong. According to FE 4, distributors would frequently buy large quantities of product so they could win a big commission or travel package, and then return the product as soon as they had collected the commission or returned from the trip. Some distributors did not even bother having the product shipped when placing their orders. LifeVantage would try to claw back the commission, but this was rarely possible if the distributor had already left the company.[15]

69.     In fact, FE 4 reported that the Company even facilitated this in a number of ways, including that it did not limit the number of units a distributor could buy and that it typically paid commissions on a weekly basis.[16]

70.     The Company's lack of controls to prevent inventory loading similarly facilitated improper sales practices, including its distributors' practice of purchasing Company products in

---

[15] These product returns likely also contributed to the Company's inventory levels steadily increasing throughout the Class Period; by June 30, 2016, the Company had **270 days** of inventory. On the December 12, 2016 call, Jaggi attributed this to "some forecasting in purchasing miscalculations that caused inventory to build beyond our internal goals." Jensen later stated "there were some miscalculations of our inventory needs relative to our position at the time, and we identified the issues and responded."

[16] According to the 2015 10-K, one of the Company's competitive advantages was that the "compensation plan also enables independent distributors to earn compensation early and often as they sell our products. Some elements of our compensation plan are paid weekly, allowing new independent distributors to receive compensation quickly. We believe more frequent payments of compensation helps us retain new independent distributors by allowing them to experience success soon after enrolling."

one country, ostensibly for personal use, and then selling them in another country where the products were not licensed or approved for sale.

71.     According to FE 3, of all of the product shipped to Hong Kong, only 10-15% remained there. The remaining 85-90% was shipped to "non-open markets" in Asia, including Vietnam, Malaysia, Singapore, and Taiwan, where it was not registered or licensed for sale. In fact, according to FE 3, much of this product was even labeled "not for resale," meaning it could not have been resold even in Hong Kong itself. The purchase of product, ostensibly "not for resale" but in quantities too large to be used by one person, is a red flag suggesting either inventory loading or illegal sale. The Company should have had basic controls in place to detect such obvious abuses of not-for-resale status. Instead, the Company actively incentivized these large purchases through its compensation policies.

72.     FE 1 also reported that distributors in Thailand and Hong Kong, and even some top-level distributors in the US, regularly purchased products and then resold them in China, Taiwan, Vietnam, Cambodia, and Laos. According to FE 1, this was simply "how they'd build up new markets."

### LifeVantage's Inadequate Internal Controls

73.     As it later admitted in the 2016 10-K, LifeVantage failed to maintain an adequate system of internal controls with respect to compliance with applicable laws and regulations.

74.     It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains compliance with applicable laws and regulations. This is made clear in SEC regulations as well as by the Committee of Sponsoring Organizations of the

Treadway Commission ("COSO") in *Internal Control—Integrated Framework* (the "COSO Report").[17]

75.     The COSO Report defines "internal control" as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the "effectiveness and efficiency of operations, reliability of financial reporting, [and] compliance with applicable laws and regulations." More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

76.     The COSO Report describes internal control as "consist[ing] of five interrelated components" that "are derived from the way management runs a business, and are integrated with the management process." The five components of an internal control framework that are needed to enable a business to achieve its objectives are: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

77.     SEC rules also require management to evaluate a company's internal controls and disclose every material weakness they are aware of. *See Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36639 (June 18, 2003).

---

[17] The COSO report was originally issued in September 1992 as a four-volume set. An *Addendum to Reporting to External Parties* was issued in May 1994. On May 14, 2013, COSO released an updated version of the entire framework.

78.     A "material weakness" is defined as "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[18] Significantly, a material weakness in internal controls over financial reporting can exist even when financial statements are not materially misstated.[19] The severity of a control deficiency does not depend upon whether a misstatement actually occurred, but rather on whether there is a "reasonable possibility" that the company's controls will fail to prevent or detect a misstatement.

79.     In the 2015 10-K and in many of the Company's 10-Qs, Defendants represented that LifeVantage's internal controls over financial reporting did not contain any material weaknesses. But, as was disclosed in the 2016 10-K, LifeVantage had internal control deficiencies that rose to the level of "a material weakness in our internal controls over financial reporting." In particular, the Company:

(a)     "had ***sold our products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not registered*** or that otherwise impose stringent restrictions on our direct selling model";

---

[18] 17 C.F.R. § 240.12b-2.

[19] PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting that Is Integrated with an Audit of Financial Statements.*

(b)     "*allowed individuals who were resident* in countries that impose stringent restrictions on our direct selling model *to enroll as independent distributors*"; and

(c)     "*did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance* that such distribution of our products complied with applicable customs, tax and other regulatory requirements."

80.     These problems arose because of fundamental deficiencies in the Company's controls. Specifically, the "inadequate controls and processes related to the *lack of documented country-specific policies and procedures* governing (i) *distributor enrollment* policies and procedures; (ii) *approved distributor payment and collection methods*; (iii) *methods for shipping and order fulfillment*; (iv) *approval requirements for transactions with distributors* outside of our approved compensation plans; and (v) lack of change controls related to changes to existing country-specific policies and procedures." In addition, the Company "had inadequate controls in place related to the *training, monitoring and oversight of our personnel* who were involved in or managed our international business operations."

81.     Clearly, there was a failure to address significant deficiencies related to LifeVantage's compliance with applicable laws. The Company shipped products into certain countries without being properly registered and inappropriately used independent distributors in connection with its direct selling method. Furthermore, there were inadequate controls over certain international practices including the lack of monitoring and training to ensure that the company was complying with customs, tax and certain regulatory requirements.

25

82.     Moreover, these control deficiencies were severe. For example, as revealed in the 2016 10-K, the Company's distributor enrollment policies and procedures were so deficient that distributors were able to enroll even if they lived in countries that banned LifeVantage's MLM business model. Similarly, FE 1 confirmed that they were so deficient that distributors were often able to create multiple accounts in order to avoid paying taxes. Once, simply by cross-checking a distributor's phone number, place of residence, and employee number, FE 1 discovered that a single distributor had signed up for *ten* separate positions within LifeVantage.

83.     Laws and regulations establish minimum standards of conduct expected on an entity. An organization needs to understand which laws, rules, and regulations apply across the entity. Some laws and regulations are well known while others are not. It was the responsibility of management and its Board of Directors to be aware of the specific regulations in the foreign countries in which it does business. Given the nature the business, this should have been clearly apparent to management. Management clearly failed to establish controls that should have been developed and deployed to ensure its compliance with the applicable country laws and regulations.

84.     There also was clearly a need for more oversight and monitoring over the Company's distributors. The requirement to adequately monitor is one of the five components of internal control as defined by COSO. The Company should have had knowledgeable and competent personnel understand the specific regulatory requirements of each foreign country that it was doing business in, and management should have identified, assessed and responded to the resulting risks to the Company's operations and controls. Had management understood the

specific regulatory requirements in these countries and adequately monitored the distributors, this internal control failure could have been caught much sooner or avoided altogether.

85.     Moreover, the 2016 10-K acknowledged that the improper sales practices took place not just in FY 2016, but also in FY 2015. Specifically, the 2016 10-K estimated that approximately $17.3 million in net revenue in FY 2016, and $6.7 million in FY 2015, "related to sales of our products to independent distributors who may have carried or shipped such products into countries in which our products are not registered or that otherwise impose stringent restrictions on our direct selling model." Accordingly, the same internal control deficiencies that were disclosed in the 2016 10-K were also present as of June 30, *2015*. Nevertheless, in the 2015 10-K, management (including the Individual Defendants) stated that based on their evaluation, the Company's internal control over financial reporting, as well as its disclosure controls and procedures (as defined in 17 C.F.R §240.13a-15), were effective as of June 30, 2015. These statements were thus false and misleading.

### The Truth Emerges

86.     On September 13, 2016, post-market, LifeVantage issued a press release and filed a Current Report on Form 8-K announcing a delay in the release of the Company's fourth quarter and fiscal year 2016 financial results. It stated, in relevant part:

> Following an internal review by Company personnel of its policies and procedures, the Company is in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales. The Company is currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.

The review relates to sales of the Company's products in certain international markets and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets. The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.

LifeVantage President and Chief Executive Officer Darren Jensen stated, "We regularly review our policies and procedures to ensure the utmost accuracy and transparency in our financial reporting. Our Board's Audit Committee has engaged independent external resources to review our policies and procedures and support our team in finalizing our financial results for fiscal 2016."

The Company will not be in a position to release financial results for the fiscal year ended June 30, 2016 until the independent review by the Audit Committee is completed.

87.     On this news, LifeVantage stock fell $1.32, or 12.69%, to close at $9.08 on September 14, 2016.

88.     On September 30, 2016, after market close, LifeVantage issued a press release and filed a Current Report on Form 8-K, announcing that, due to the delay in filing its Annual Report, the Company had received a letter from NASDAQ on September 29, 2016 stating the Company had "60 calendar days to submit a plan to regain compliance" with Listing Rule 5250(c)(1), which "requires NASDAQ listed companies to timely file all required periodic financial reports with the Securities and Exchange Commission." The press release continued:

As previously announced on September 13, 2016, the Audit Committee of the Company's Board of Directors is conducting an independent review of

28

> sales of the Company's products in certain international markets, not including Japan, and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets. The Audit Committee, working with independent counsel it has retained, is working diligently to address the situation.

89.     The 60-day deadline meant that the Company had until November 28, 2016 to submit a plan to NASDAQ.

90.     However, there was no further news until November 10, 2016 (after market close), when LifeVantage filed a Notification of Late Filing on Form 12b-25 stating that it was "unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016… prior to the filing deadline." It continued:

> As previously disclosed, the Audit Committee of the Company's Board of Directors is conducting an independent review of sales of the Company's products into certain international markets, not including Japan, and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets. The Audit Committee, working with independent counsel it has retained, is working diligently to address the situation. Once complete, the Company intends to file the Form 10-K for the fiscal year ended June 30, 2016 and the Form 10-Q with the SEC as soon as reasonably practicable.

91.     On this news, LifeVantage stock fell $0.49, or 5.11%, to close at $9.10 on November 11, 2016.

92.     On November 18, 2016, after market close, LifeVantage issued a press release and filed a Current Report on Form 8-K, announcing that it had received a letter from NASDAQ reiterating that "the Company has until November 28, 2016 to submit a plan to regain compliance with respect to these delinquent reports."

93.     On this news, LifeVantage stock fell $0.43, or 4.84%, to close at $8.46 on November 21, 2016.

94.     On December 12, 2016, after market close, the Company finally filed its 2016 10-K and 2017 Q1 10-Q.

95.     The 2016 10-K stated the following under the heading "Audit Committee Independent Review":

> On September 13, 2016, we announced the delayed filing of this Annual Report on Form 10-K to allow the Audit Committee of our Board of Directors to conduct an independent review related to the distribution of our products into countries outside the U.S, in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model, and the associated revenue and tax and other accruals associated with such sales. This independent review was initiated following internal reviews by Company personnel and was further informed by the content of employee complaints. The Audit Committee retained independent counsel to assist it in conducting the review. Based on its independent review, the Audit Committee determined that *(i) we had sold our products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model; (ii) we allowed individuals who were resident in countries that impose stringent restrictions on our direct selling model to enroll as independent distributors; and (iii) we did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance that such distribution of our products complied with applicable customs, tax and other regulatory requirements. The inadequate controls and processes related to the lack of documented country-specific policies and procedures governing (i) distributor enrollment policies and procedures; (ii) approved distributor payment and collection methods; (iii) methods for shipping and order fulfillment; (iv) approval requirements for transactions with distributors outside of our approved compensation plans; and (v) lack of change controls related to changes to existing country-specific policies and*

*procedures*. In addition, we had **inadequate controls in place related to the training, monitoring and oversight of our personnel who were involved in or managed our international business operations**. Accordingly, we **identified a material weakness in our internal controls over financial reporting** as of the period ended June 30, 2016.

Notwithstanding this material weakness, our management and Audit Committee concluded that the revenue related to the sales that were the subject of the Audit Committee's independent review was properly recognized and that no tax or other accruals relating to such sales were necessary. In making this determination, we obtained international tax and legal advice from external accounting and law firms that have relevant country-specific expertise regarding our potential obligations and liabilities associated with the import and distribution of our products into the countries described above. Based on this advice, we have not established a loss contingency accrual for potential import or other liabilities in these countries, as we believe the likelihood of any such liabilities being assessed against the Company is remote, in part, based on the evaluation of country-specific import laws and regulations and on our actions to stop or restrict the processes used by independent distributors to carry or ship our products into countries where such products are not registered. Accordingly, our management and Audit Committee concluded that (i) the consolidated financial statements included in this Annual Report on Form 10-K fairly present in all material respects the Company's financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America and (ii) no restatement of prior period financial statements is required.

96.     With respect to the impact on the Company's financials, the 2016 10-K stated:

In the years ended June 30, 2016 and 2015, we estimate that approximately **$17.3 million and $6.7 million in net revenue**, respectively, **related to sales of our products to independent distributors who may have carried or shipped such products into countries in which our products are not registered or that otherwise impose stringent restrictions on our direct selling model**.

97.     The 2016 10-K also described the steps the Company was taking to address the

material weakness:

> To remediate the material weakness in our internal controls over financial
> reporting described above, we are developing and implementing new
> control policies and procedures regarding the international business
> policies, practices, monitoring and training for each country outside the
> U.S. in which we do business. ***As an initial step, we implemented
> changes to our systems and distributor enrollment requirements
> intended to stop or restrict the processes used by independent
> distributors to purchase and carry or ship our products into countries in
> which those products are not registered or that otherwise impose
> stringent restrictions on our direct selling model***. Looking forward, we
> are in the process of ***developing appropriate country-specific policies and
> procedures to help ensure that our products are not distributed or sold
> into countries without complying with applicable customs, tax and other
> regulatory requirements***. Additional steps we have taken and are taking to
> remediate the material weakness in our internal controls over financial
> reporting include creating market-specific policy manuals documenting
> the following:
>
> • ***distributor enrollment requirements by country***, including the
> requirement of sufficient and appropriate oversight and senior
> management approvals for any changes to such country-specific
> policies;
>
> • ***approved distributor payment and collection policies by country***,
> including the requirement of sufficient and appropriate oversight and
> senior management approvals for any changes to such country-specific
> policies;
>
> • ***approved shipping, order fulfillment and customs import policies by
> countr***y, including the requirement of sufficient and appropriate
> oversight and senior management approvals for any changes to such
> country-specific policies; and
>
> • approval requirements for transactions between us and independent
> distributors outside of our approved compensation plans.

In addition, as we implement country-specific policies, we are requiring that we obtain international tax and legal advice from external accounting and law firms that have relevant country-specific expertise to help ensure that potential international tax and legal issues are appropriately identified and addressed. ***We have also started the process of evaluating and re-allocating personnel resources to ensure that each market has adequate resources to support our remediation efforts and our new processes and controls***. We also will establish and conduct company-wide training programs on our new policies and controls.

These actions are subject to ongoing review by our management, including our Chief Executive Officer and Chief Financial Officer, as well as oversight by our Audit Committee. Although we plan to complete this remediation process as quickly as possible, ***the material weakness in our internal control over financial reporting will not be considered remediated until the applicable remedial processes and controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. As a result, we cannot, at this time, estimate when such remediation will be completed***. In addition, the remediation steps we have taken, are taking and expect to take may not effectively remediate the material weakness, in which case our internal control over financial reporting would continue to be ineffective.

98.     The 2016 10-K also stated, in its discussion of Risk Factors:

This review has required us to expend significant management time and incur significant accounting, legal, and other expenses. Through the end of the first two quarters of fiscal 2017, we expect to incur between approximately $2.5 million to $3.0 million in additional selling, general and administrative expense related to the audit committee review and management's assessment of the related financial and internal control impact. In addition, through approximately the end of fiscal 2017, ***we expect to incur significant additional expenses associated with the remediation of internal controls over financial reporting and managing related operational issues***.

Based on its review, the audit committee determined that (i) we had sold our products to independent distributors who carried or shipped such

products primarily into four countries outside the U.S. in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model; (ii) we allowed individuals who were resident in countries that impose stringent restrictions on our direct selling model to enroll as independent distributors; and (iii) we did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance that such distribution of our products complied with applicable customs, tax and other regulatory requirements. ***We have taken steps to help ensure that our products are not distributed or sold into countries without complying with applicable customs, tax and other regulatory requirements and to appropriately verify the residency of individuals who want to become our independent distributors***. Consistent with these regulatory requirements, in the future our independent distributors may be able to purchase a limited quantity of such products for personal consumption in one or more of these countries. Nevertheless, ***we expect that our revenue in future periods from sales of our products that are carried or shipped into these countries will be significantly lower than fiscal 2016***.

99.     The Company provided additional details during the December 12, 2016 conference call. Garry Mauro, Chairman of the Board, stated:

During the FY16 closing process, employees in our tax department raised concerns about our international policies dealing with how our products are purchased or sold in some international markets, and taxes and tariffs associated with those sales. It's important to note that these potential policy weaknesses were identified internally.

Once the Board was notified, our audit committee initiated an independent review utilizing independent external legal counsel and independent external accounting experts. A formal SOX complaint was submitted by an employee after the review was underway, and the audit committee took this information into account and evaluated and completed due diligence on all issues raised. We analyzed transactions, policies, and procedures to determine if there were weaknesses and to determine why they may have happened.

We aspire to best practices in all areas, and the depth of this process was to ensure just that. The questions we addressed in our review revolved around several policies and procedures concerning distributor activities in select international markets. But *as the review progressed, the scope was expanded to a general review of our policies and procedures across all international markets*.

The type of activities reviewed included our *products being purchased for personal consumption and being taken into markets where they had not been approved for resale*. In general, most countries have an allowance for the personal importation of items for personal use; however, we identified an increase in this type of activity that needed additional review, primarily for tariff and tax purposes. It is important that we have in place the policies, procedures, and internal systems to help ensure compliance, reduce the risk of abuse, and establish best practices well above our broader industries.

Once the review was concluded, we then took steps to implement the appropriate remedial measures. As part of this comprehensive review, we engaged international advisors with relevant country-specific expertise to help ensure our policies and procedures were appropriately aligned with local rules.

Finally, we could not issue our 10-K until all these steps were completed to ensure that we were fully compliant and to ascertain if there was any impact to our financial statements. Ultimately, other than the high cost of the external experts utilized in the review, which totaled approximately $2.5 million to $3 million, the impact to our delayed financials was negligible; however, *we concluded that we had material weaknesses in some of our international controls, and our auditors issued an adverse opinion relating to our internal control over financial reporting*.

We have already taken action to outsource our international tax and tariff responsibilities to help remediate this weakness. Our Board of Directors and the entire LifeVantage management team are committed to transparent, accurate, and thorough financial reporting and disclosure. While the duration of the review and filings delay was longer than we or our shareholders preferred, our number one goal was to complete a thorough and comprehensive evaluation. We utilized independent forensic

accountants and outside counsel, both domestically and in international markets, to ensure thoroughness and to support our conclusions.

Our corporate philosophy is to ensure dedication to high-quality ethical business practices and financial reporting. We have now instituted best practices that will make us a stronger Company, with improved policies, procedures, and controls as a result.

100.     Defendant Jensen then described "some of the remedial measures being implemented as a result of the recent review":

We are implementing changes that include enhanced support from our country-specific experts, including legal, tax, and customs advice. Given the complexity of operating in multiple international markets, we have also begun to outsource key activities where external support is more effective and efficient. Let me highlight some of the specific policy weaknesses discovered and the steps we have taken.

First, in certain markets, *the documentation and verification obtained during the enrollment process for people who wanted to become independent distributors was insufficient*. We have received local advice, and now, where necessary, require in-person verification of local resident identification.

Second, *we have instituted enhanced policies regarding the purchase for personal consumption of products in markets where such products are not registered or otherwise restrict our direct selling model*.

Third, *policies regarding distributor payments were not appropriately documented in some markets*. We have strengthened these policies and instituted new controls covering payments in local markets and currencies.

Fourth, transfer pricing and commissions rebalancing procedures in international markets have been refined to more effectively provide for the consistency in cross-border purposes. For example, a distributor may purchase in one market with delivery to customers in another market where pricing, currency, and commission rates could vary.

Fifth, we have structurally aligned ourselves to outsource tax and tariff advisory functions to ensure we have access to the most up-to-date market-specific expertise.

Sixth, *we have started evaluating and reallocating our personnel to ensure that each market has adequate resources to support our enhanced processes and controls*. We will also establish and conduct Company-wide training programs.

We will continue to refine and update all of our international country operating and launch policies to ensure best practices are followed. The vast majority of these enhancements will improve our controls without any measurable impact to our distributors or our sales activities.

A few of the remedies being implemented will have, and in some cases, have already had, an impact on our sales levels. This impact materialized to a modest extent during the first quarter of FY17, as initial actions were taken during the review process. *We immediately eliminated substantially all nonresident purchases worldwide.*

Additionally, *new policies around verification of local market resident identification have interrupted sales in one market*. The impact to our in-market sales levels should be more evident in the second quarter. Our new policies will again allow nonresident purchases for personal consumption in markets where this practice is permitted.

We anticipate that in the third quarter, we will begin to regain a portion of these sales. I believe these enhanced policies and controls will provide proper guidance within which we can build our global business opportunity.

101.     Jensen later added that the Company expected "second-quarter revenue in the range of $48 million to $49 million, which would be down sequentially versus the first quarter of FY17" because sales during the second quarter had been "negatively impacted by the disruption surrounding our policy changes affecting international markets."

102.     As one commentator noted:

37

> LifeVantage's assessment that 8% of revenue or around $17 million in
> sales in fiscal 2016 were linked to questionable international sales
> practices is significant. ***That amount represents 100% of the company's
> revenue growth over the prior year***. LifeVantage reported revenue of
> $207 million in 2016, up $17 million from $190 million in 2015.[20]

103.    On this news, LifeVantage stock fell $1.02, or 10.53%, to close at $8.67 on

December 13, 2016. The next day, it fell $0.32, or 3.69%, to close at $8.35 on December 14,

2016.

104.    Around the same time, the Company also announced several management

changes.

105.    First, on December 12, 2016, after market close, the Company filed a Form 8-K

announcing that Defendant Jensen's employment agreement had been amended to "strengthen[]

certain nonsolicitation and noncompete restrictive covenants," to "make[] explicit that a

Company incentive compensation clawback policy will apply when adopted to Mr. Jensen's

qualifying incentive compensation," and to reflect that Jensen had "agreed to waive for future

fiscal years his rights to certain cash incentive bonus awards described in his original

employment agreement."

106.    Second, on December 15, 2016, the Company filed a Form 8-K announcing that

the Company had "terminated the employment of Robert Urban, our Chief Operating Officer."

107.    Finally, on January 18, 2017, after market close, LifeVantage issued a press

release and filed a Current Report on Form 8-K announcing that it had terminated the

---

[20] Christine Richard, *Are Investors Underestimating The Risks To Herbalife's International
Business?*, Seeking Alpha (Dec. 20, 2016), http://seekingalpha.com/article/4031549-investors-
underestimating-risks-herbalifes-international-business.

employment of Defendant Jaggi, the Company's former CFO and had undertaken a search for a

new permanent CFO. Meanwhile, the Company had appointed Gary Koos as Interim CFO. The

press release also quoted Jensen as follows:

> "We are pleased to have Gary Koos join the company as Interim CFO,"
> said LifeVantage President and Chief Executive Officer, Darren Jensen.
> "In addition to his international financial expertise and leadership
> capabilities, Gary's extensive operational skills and experience
> establishing enterprise-wide policies and controls will be vital as we
> continue to focus on creating value for our shareholders."

108.    On this news, LifeVantage stock fell $0.39, or 5.16%, to close at $7.17 on

January 19, 2017.

109.    As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Zhang Lead Plaintiffs and other Class

members have suffered significant losses and damages.

### **MATERIALLY FALSE AND MISLEADING STATEMENTS**

110.    During the Class Period, Defendants represented that the Company's internal

controls were sound and adequate and that they monitored and "systematically" reviewed

potential misbehavior by their independent distributors through the Company's internal

compliance department. In truth, the Company lacked the most fundamental internal controls

over its international distributors and its compliance with applicable laws and regulations.

111.    On September 1, 2015, LifeVantage filed its 2015 10-K, which, while describing

the Company's "Competitive Advantages," stated the following:

> **Our Culture**: We are committed to creating a culture for our independent
> distributors and employees that focuses on ethical, legal and transparent
> business practices. At enrollment, our independent distributors agree to
> abide by our policies and procedures. ***Our policies and procedures, when***

39

***followed, ensure that our independent distributors comply with applicable laws and regulations. Our compliance department monitors the activities of our independent distributors as part of our effort to enforce our policies and procedures***. Similarly, our code of business conduct and ethics sets forth guidelines and expectations for our employees. We believe our ethical, legal and transparent culture attracts highly qualified employees and independent distributors who share our commitment to these principles.

112.    The 2015 10-K also stated:

**Distributor Compliance Activities**

Given that our independent distributors are independent contractors, we do not control or direct their promotional efforts. We do, however, require that our independent distributors abide by policies and procedures that require them to act in an ethical manner and in compliance with applicable laws and regulations. As a member of the United States Direct Selling Association and similar organizations in many of the markets where we do business, we are also subject to the ethical business practices and consumer service standards required by the industry's code of ethics.

Independent distributors must represent to us that their receipt of commissions is based on retail sales and substantial personal sales efforts. We must produce or pre-approve all sales aids used by distributors such as brochures and online materials. ***Products may be promoted only by personal contact or by collateral materials produced or approved by us.*** Independent distributors may not use our trademarks or other intellectual property without our consent.

***We monitor and systematically review alleged independent distributor misbehavior through our internal compliance department***. If we determine one of our independent distributors has violated any of our policies and procedures, we may discipline the independent distributor and may terminate the independent distributor's rights to distribute our products. When necessary, we have brought legal action against independent distributors, or former independent distributors, to enforce our policies and procedures. Short of termination or legal action, we may impose sanctions against independent distributors whose actions are in

violation of our policies and procedures. Such sanctions may include warnings, probation, withdrawal or denial of an award, suspension of privileges of a distributorship, fines and/or withholding of commissions until specified conditions are satisfied, or other appropriate injunctive relief.

113.    The 2015 10-K also stated the following, under Risk Factors:

Extensive federal, state, local and international laws regulate our business, products and direct selling activities. Because we have expanded into foreign countries, *our policies and procedures for our independent distributors differ slightly in some countries due to the different legal requirements of each country in which we do business*.

114.    The 2015 10-K also stated the following, under Risk Factors:

Our independent distributors are not employees and act independent of us. However, activities by our independent distributors that violate applicable laws or regulations could result in government or third-party actions against us, which could harm our business. *Our independent distributors agree to abide by our strict policies and procedures designed to ensure our independent distributors will comply with legal requirements. We have a compliance department that addresses violations of our independent distributors when they become known to us*. However, given the size of our independent distributor network, we experience problems with independent distributors violating our policies and procedures from time to time and are not always able to discover or remedy such violations.

115.    These representations were false and misleading because they implied that the Company had policies and procedures that differed in appropriate ways in "each country in which we do business," that the Company's compliance department monitored the distributors and enforced these policies, and that the Company had otherwise adopted controls capable of providing reasonable assurance that these policies were being followed. But in fact, the Company lacked the most fundamental internal controls over its international distributors and its compliance with applicable laws and regulations.

41

116.    The 2015 10-K also contained signed certifications by the Individual Defendants

stating:

> 1. I have reviewed this Annual Report on Form 10-K of LifeVantage Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

42

effectiveness of the disclosure controls and procedures, as of the end
of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal
control over financial reporting that occurred during the registrant's
most recent fiscal quarter (the registrant's fourth fiscal quarter in the
case of an annual report) that has materially affected, or is
reasonably likely to materially affect, the registrant's internal control
over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based
on our most recent evaluation of internal control over financial reporting,
to the registrant's auditors and the audit committee of the registrant's
board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design
or operation of internal control over financial reporting which are
reasonably likely to adversely affect the registrant's ability to record,
process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or
other employees who have a significant role in the registrant's
internal control over financial reporting.

117.     On November 4, 2015, LifeVantage filed a quarterly report on Form 10-Q to

announce the Company's financial and operating results for the quarter ended September 30,

2015 (the "Q1 2016 10-Q"). The Q1 2016 10-Q contained signed certifications by the Individual

Defendants stating that the financial information contained in the Q1 2016 10-Q was accurate

and disclosed any material changes to the Company's internal control over financial reporting.

118.     On February 9, 2016, LifeVantage filed a Quarterly Report on Form 10-Q,

announcing the Company's financial and operating results for the quarter ended December 31,

2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q contained signed certifications by the Individual

Defendants stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

119.    On May 4, 2016, LifeVantage filed a Quarterly Report on Form 10-Q, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q contained signed certifications by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

120.    These statements were false and misleading because the Company lacked fundamental internal controls over its international distributors and its compliance with applicable laws and regulations.

121.    During a presentation at the ICR Conference on January 12, 2016, Jensen stated that "there's always an evolving regulatory environment within direct selling, and we have a commitment to stay at the forefront of these initiatives."

122.    During the February 9, 2016 conference call, Jensen stated the following:

> As those of you that follow our industry are aware, the regulatory environment is constantly evolving and over the past several months, we have seen new regulatory guidance come into play. *We have proactively taken steps to ensure that we are fully in compliance with this ever changing regulatory landscape.*
>
> Despite the fact that we are a relatively small company, when compared to others in our industry, *we believe that we are the industry leader in terms of setting a standard for compliance*. While these investments resulted in some additional expense that was not previously factored into our guidance, we will benefit in the long term.

123.    Jensen then summarized:

In summary, we are encouraged by what we have accomplished in the first half of fiscal 2016, particularly our return to both year-over-year and sequential sales growth. Our growth strategy was designed to enable us to realize its benefits beginning in fiscal year 2016, with accelerated and further improvements in coming years as our initiatives take hold across our entire global organization.

We launched our new products, including a new brand, ***positioned our Company to enter new international markets adapted to the ever changing regulatory landscape***, and brought in new technologies that will ultimately better position our business for long-term growth.

124.    These statements were false and misleading because they implied that the

Company had policies and procedures that were appropriate for the "new international markets"

and that were "adapted to the ever changing regulatory landscape," even though in fact, the

Company lacked fundamental internal controls over its international distributors and its

compliance with applicable laws and regulations, had no basis for any belief that it was "the

industry leader in terms of setting a standard for compliance," and did not take "steps to ensure

that we are fully in compliance with this ever changing regulatory landscape."

125.    These representations were false and misleading because they implied that the

Company had policies and procedures that differed in appropriate ways in "each country in

which we do business," that the Company's compliance department monitored the distributors

and enforced these policies, and that the Company had otherwise adopted controls capable of

providing reasonable assurance that these policies were being followed. But in fact, the

Company lacked the most fundamental internal controls over its international distributors and its

compliance with applicable laws and regulations.

## SCIENTER

126.     Defendants' scienter is demonstrated by their utter failure to establish basic internal controls capable of providing reasonable assurance of compliance with applicable laws and regulations, even though they knew that improper sales practices and other legal violations were common in the MLM industry. By failing to enact such basic internal controls while actively creating new incentives for distributors to build organizational volume as quickly as possible, Defendants effectively invited the improper sales practices that were later disclosed in the 2016 10-K.

127.     There were several public examples of similar improper sales practices at other MLM companies in the past few years. For example, in January 2014, it became known that Nu Skin had been violating Chinese laws prohibiting MLMs in that (a) Nu Skin required the payment of an entry fee to become a direct seller; 2) direct sellers and distributors were encouraged to recruit a "sales team" of downlines; and 3) Nu Skin-sponsored training videos encouraged the establishment of downlines and the payment of multi-level compensation in Mainland China.[21]

128.     The July 15, 2016 settlement between Herbalife and the FTC further underscored to Defendants the importance of maintaining internal controls capable of providing "robust, verifiable proof that products are reaching good-faith consumers."[22] Such basic internal controls

---

[21] *See* Liang Fei, "Shady Sales," *Global Times*, Jan. 21, 2014, http://www.globaltimes.cn/content/838684.shtml.

[22] Roger Parloff, *Herbalife Deal Poses Challenges For The Industry*, Fortune, Jul 19. 2016, http://fortune.com/2016/07/19/herbalife-deal-challenges-industry/.

were necessary simply to ensure that an MLM firm didn't devolve into a pyramid scheme, in addition to ensuring that it could keep track of whether its distributors were engaging in improper sales practices in countries where the Company lacked licenses.[23]

129.     Moreover, Jensen knew of similar improper sales practices in the MLM industry through his earlier employment. Before joining LifeVantage, Jensen served as Chief Sales Officer and/or President of the Americas for Jeunesse Global, LLC ("Jeunesse"), a multi-level marketing company that sells anti-aging creams and health supplements in the United States and internationally. On January 8, 2016, Jeunesse sued Jensen for allegedly violating the confidentiality and non-solicitation provisions of his employment agreement. During that lawsuit, in connection with a discovery dispute pertaining to certain of his affirmative defenses, Jensen alleged the following:

> While employed by [Jeunesse], Mr. ***Jensen learned of various business practices and decisions made by some of the highest executives of [Jeunesse], which he believed to be unsavory, unethical, and perhaps even illegal. Such practices and decisions included improper sales activities in certain specific foreign markets and attempting to sell products in foreign markets, including China, without obtaining required legal authorizations to do so.*** Additionally, Mr. Jensen has knowledge regarding [Jeunesse]'s termination of Matthew Nestler, a former high-level distributor for [Jeunesse], and Mr. Jensen has been identified as a witness in pending litigation between [Jeunesse] and Mr. Nestler. ***Prior to leaving his employment with [Jeunesse], Mr. Jensen voiced concerns about or opposition to these practices and decisions, expressing disappointment with [Jeunesse]'s culture of encouraging profitability through any means necessary***. And when Mr. Jensen left his employment with [Jeunesse], he informed superiors at [Jeunesse] that a motivating factor in his decision to

---

[23] Christine Richard, *Are Investors Underestimating The Risks To Herbalife's International Business?*, Seeking Alpha (Dec. 20, 2016), http://seekingalpha.com/article/4031549-investors-underestimating-risks-herbalifes-international-business.

> leave was his desire to work for a public company that operated with a
> different culture, higher standards, and greater transparency.
>
> Mr. Jensen has a good faith basis to believe that [Jeunesse] brought this
> lawsuit for improper retaliatory reasons and to muzzle him from
> expressing his views in the event of legal proceedings against [Jeunesse]
> arising from practices and decisions about which Mr. Jensen disagreed
> with [Jeunesse].[24]

130.    Because the Individual Defendants knew about similar improper sales practices

at other MLM companies, they knew or should have known that (a) there was a real risk that

LifeVantage distributors could also be engaging in similar misconduct; (b) there was a real risk

that the new incentives and bonus pools, particularly the incentives for rapid growth, would only

further encourage distributors to engage in these improper sales practices as a potential

competitive advantage; and (c) the Company needed to ensure its internal controls were capable

of preventing or at least detecting such behavior.

131.    Jensen also often stated that he remained in close contact with the Company's

distributors. For example, during a presentation at the ICR Conference on January 12, 2016,

Jensen emphasized that "we have a direct line of contact right with our customers, as well as

with our distributors. So quite often I'm receiving calls directly from customers or from our

distributors. So we have a lot of contact with them." Defendants also frequently interacted

regularly with LifeVantage's Field Advisory Board, a group composed of the Company's top

distributors. Through these interactions, Defendants

---

[24] Obj. to Order Granting Pl.'s Mot. for Protective Order at 3–4, *Jeunesse Global, LLC v. Jensen*,
No. 6-16-cv-00162-GAP-DAB (M.D. Fla. Jul. 18, 2016), ECF No. 34.

132.     As the 2016 10-K later acknowledged, the high turnover in FY 2015 in the

Company's top management and even its independent auditor was likely "a contributing factor to

the material weakness in our internal control over financial reporting related to our business

policies, practices, monitoring and training governing our international business operations."

This supports an inference that Defendants were aware of how the turnover contributed to the

material weakness.

133.     Moreover, the Company's "business policies, practices, monitoring and training

governing our international business operations" are all core operations of the Company. This

supports an inference of scienter as to the material weakness related thereto.

134.     The Company is liable for the acts of the Individual Defendants under the

doctrine of respondeat superior and common law principles of agency, as all of the wrongful acts

complained of herein were carried out within the scope of their employment.

## CLASS-ACTION ALLEGATIONS

135.     Zhang Lead Plaintiffs bring this action as a class action under Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of all persons other than Defendants who purchased

or otherwise acquired LifeVantage securities during the Class Period (the "Class"). Excluded

from the Class are Defendants; the officers and directors of the Company at all relevant times;

members of their immediate families; their legal representatives, heirs, successors, or assigns;

and any entity in which Defendants have or had a controlling interest.

136.     The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, LifeVantage securities were actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by LifeVantage or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

137.    Zhang Lead Plaintiffs' claims are typical of the claims of the members of the

Class as all members of the Class were similarly affected by Defendants' wrongful conduct in

violation of federal law that is complained of herein.

138.    Zhang Lead Plaintiffs will fairly and adequately protect the interests of the

members of the Class and have retained counsel competent and experienced in class and

securities litigation. Zhang Lead Plaintiffs have no interests antagonistic to or in conflict with

those of the Class.

139.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged
  herein;

- whether statements made by Defendants to the investing public during the Class
  Period misrepresented material facts about the business, operations and
  management of LifeVantage;

- whether the Individual Defendants caused LifeVantage to issue false and
  misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of LifeVantage securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

141.    Zhang Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- LifeVantage securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Zhang Lead Plaintiffs and members of the Class purchased, acquired and/or sold LifeVantage securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

142. Based upon the foregoing, Zhang Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

143. Alternatively, Zhang Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And SEC Rule 10b-5)

144. Zhang Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

146. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Zhang Lead

Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Zhang Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of LifeVantage securities; and (iii) cause Zhang Lead Plaintiffs and other members of the Class to purchase or otherwise acquire LifeVantage securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

147.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for LifeVantage securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about LifeVantage's finances and business prospects.

148.    By virtue of their positions at LifeVantage, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Zhang Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of

the statements made, although such facts were readily available to Defendants. Said acts and

omissions of Defendants were committed willfully or with reckless disregard for the truth. In

addition, each Defendant knew or recklessly disregarded that material facts were being

misrepresented or omitted as described above.

149.    Defendants were personally motivated to make false statements and omit

material information necessary to make the statements not misleading in order to personally

benefit from the sale of LifeVantage securities from their personal portfolios.

150.    Information showing that Defendants acted knowingly or with reckless disregard

for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of LifeVantage, the Individual Defendants had knowledge of the details of

LifeVantage's internal affairs.

151.    The Individual Defendants are liable both directly and indirectly for the wrongs

complained of herein. Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of

LifeVantage. As officers and/or directors of a publicly-held company, the Individual Defendants

had a duty to disseminate timely, accurate, and truthful information with respect to

LifeVantage's businesses, operations, future financial condition and future prospects. As a result

of the dissemination of the aforementioned false and misleading reports, releases and public

statements, the market price of LifeVantage securities was artificially inflated throughout the

Class Period. In ignorance of the adverse facts concerning LifeVantage's business and financial

condition which were concealed by Defendants, Zhang Lead Plaintiffs and the other members of

the Class purchased or otherwise acquired LifeVantage securities at artificially inflated prices

and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

152.     During the Class Period, LifeVantage securities were traded on an active and efficient market. Zhang Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of LifeVantage securities at prices artificially inflated by Defendants' wrongful conduct. Had Zhang Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Zhang Lead Plaintiffs and the Class, the true value of LifeVantage securities was substantially lower than the prices paid by Zhang Lead Plaintiffs and the other members of the Class. The market price of LifeVantage securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaint Zhang Lead Plaintiffs and Class members.

153.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

154.     As a direct and proximate result of Defendants' wrongful conduct, Zhang Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

155.    Zhang Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.    During the Class Period, the Individual Defendants participated in the operation and management of LifeVantage, and conducted and participated, directly and indirectly, in the conduct of LifeVantage's business affairs. Because of their senior positions, they knew the adverse non-public information about LifeVantage's misstatement of income and expenses and false financial statements.

157.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LifeVantage's financial condition and results of operations, and to correct promptly any public statements issued by LifeVantage which had become materially false or misleading.

158.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LifeVantage disseminated in the marketplace during the Class Period concerning LifeVantage's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LifeVantage to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of LifeVantage within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LifeVantage securities.

Case 2:16-cv-00965-TS   Document 38   Filed 01/27/17   Page 59 of 60

159.    Each of the Individual Defendants, therefore, acted as a controlling person of LifeVantage. By reason of their senior management positions and/or being directors of LifeVantage, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, LifeVantage to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of LifeVantage and possessed the power to control the specific activities which comprise the primary violations about which Zhang Lead Plaintiffs and the other members of the Class complain.

160.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LifeVantage.

## PRAYER FOR RELIEF

**WHEREFORE**, Zhang Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23 and certifying Zhang Lead Plaintiffs as Class Representative;

B.    Requiring Defendants to pay damages sustained by Zhang Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Zhang Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Zhang Lead Plaintiffs hereby demand a trial by jury.

Dated: January 27, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
         ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**CHRISTENSEN YOUNG &**
**ASSOCIATES, PLLC**
Zane L. Christensen (USB 14614)
Steven A. Christensen (USB 5190)
9980 South 300 West, Ste 200
Sandy, UT 84070
Phone: 801-676-6447
Email: zane@christensenyounglaw.com
         steven@christensenyounglaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
1999 Avenue of the Stars
Suite 1100
Los Angeles, California 90067
Telephone: 1-800-977-7401
Fax: 1-800-536-0065
michael@goldberglawpc.com
brian@goldberglawpc.com

*Attorneys for Zhang Lead Plaintiffs*