IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUN ZHANG, Individually and On behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>LIFEVANTAGE CORPORATION, DARREN JAY JENSEN and MARK R. JAGGI,<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS<br><br><br><br>Case No. 2:16-CV-965 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendants' Motion to Dismiss for Failure to State a

Claim. For the reasons discussed below, the Court will grant the Motion and dismiss Plaintiffs'

claims without prejudice.

## I. BACKGROUND

LifeVantage is a network marketing company incorporated in Colorado and

headquartered in Utah. LifeVantage sells dietary supplements, skin care products, energy drink

mixes, pet supplements, and other products. LifeVantage sells products in the United States,

Japan, Hong Kong, Australia, Canada, Philippines, Mexico, and Thailand.

Beginning in 2009, LifeVantage adopted a business model known as Multi-Level

Marketing, or "MLM." Instead of selling its products in retail stores, LifeVantage relies on

"independent distributors" both to sell its products and to recruit additional distributors. MLMs

are subject to regulatory constraints in most countries and are banned in others.

LifeVantage defines an independent distributor as someone who purchases LifeVantage products at wholesale prices and either resells it at retail prices or consumes it. An independent distributor can establish a "downline" by recruiting additional distributors and may earn a commission on the product purchased by those in her downline.

After adopting the MLM model, LifeVantage grew rapidly. The company's revenue roughly tripled annually for three consecutive years, surging from $4.14 million to $126.18 million. Revenue rose again in 2013 to $208.18 million before plateauing and beginning to decline in 2014.

On February 4, 2015, LifeVantage's Board stated that a new CEO was necessary because LifeVantage's growth had reached a plateau, and was therefore not progressing in line with its business model. Another reason the Company gave for hiring a new CEO was to "successfully manage the complexities of international product distribution and finance."[1] In 2015, nearly all of the Company's top management resigned, including the President and CEO, Chief Financial Officer, Chief Sales Officer, Chief Science Officer, and the General Counsel. Around the same time, LifeVantage eliminated the position of General Counsel, appointed a new Chief Marketing Officer, and changed auditors.

LifeVantage's new CEO, Mr. Jensen, announced new initiatives to enhance the business in September, 2015. These included rewards for the recruitment of new distributors and incentives for newly enrolled distributors to purchase more product. Mr. Jensen also promoted

---

[1] Docket No. 38, ¶ 48.

global expansion by "targeting certain gateway markets which in turn opens up opportunities in more and more markets."[2]

SEC rules require management to evaluate a company's internal controls and disclose every material weakness of which they are aware.[3] A material weakness is defined as "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[4] In a 2015 10-K and in four 10-Q Forms, Defendants represented that LifeVantage's internal controls over financial reporting did not contain any material weaknesses.[5] In various statements, Defendants touted the adequacy of the Company's international controls, distributor oversight, and LifeVantage's compliance department.

Then, in 2016, LifeVantage employees raised concerns about LifeVantage's international policies, and an employee submitted a formal Sarbanes-Oxley complaint. An independent review led to a revelation that improper sales practices had occurred in 2015 and 2016, and that LifeVantage had material weaknesses in some of its internal controls. In connection with this investigation, revelation, and subsequent remedial efforts, the market value of LifeVantage securities fell precipitously. In this class action lawsuit against CEO Mr. Jensen, CFO Mr. Jaggi, and LifeVantage, Plaintiffs claim that Defendants' representations regarding the adequacy of

---

[2] *Id.* ¶ 62.
[3] *See Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36639 (June 18, 2003).
[4] 17 C.F.R. § 240.12b-2.
[5] Docket No. 38, ¶ 79.

LifeVantage's internal controls were false and made recklessly or with the intent to mislead investors.

## II.  STANDARD OF REVIEW

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiffs as the nonmoving party.[6]  Plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face,"[7] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[8]  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[9]

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[10]  As the Court in *Iqbal* stated,

> only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.[11]

---

[6] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[7] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[9] *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

[10] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[11] *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted).

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[12] SEC Rule 10b–5 implements Section 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security."[13] Section 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation."[14]

"A plaintiff suing under [§] 10(b) . . . bears a heavy burden at the pleading stage."[15] To properly state a claim for securities fraud, a complaint must allege facts supporting the following:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.[16]

Federal securities fraud claims are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b), which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[17] The Tenth Circuit requires a

---

[12] 15 U.S.C. § 78j(b).

[13] 17 C.F.R. § 240.10b–5(b).

[14] *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)).

[15] *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012).

[16] *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

[17] Fed. R. Civ. P. 9(b).

plaintiff pleading fraud to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[18]

## III. DISCUSSION

Defendants argue that the Amended Complaint: (1) fails to specify each statement alleged to have been misleading; (2) fails to plead sufficient facts supporting the misleading nature of the statements; (3) fails to plead particularized facts giving rise to a strong inference of scienter; and (4) fails to state a claim for relief under Section 20(a). Each argument will be addressed in turn.

### A. FALSITY

#### 1. Specifying Challenged Statements

First, Defendants complain that Plaintiffs failed to identify each challenged statement with specificity. The Amended Complaint lists allegedly misleading statements in lengthy block quotes; something courts have found unhelpful in pleading fraud with particularity.[19] However, Plaintiffs used bold lettering to flag specific statements, making it possible for Defendants and the Court to isolate the challenged statements as follows:

##### a. *Regarding distributor oversight and compliance*:

1. "Our policies and procedures, when followed, ensure that our independent distributors comply with applicable laws and regulations."[20]
2. "Products may be promoted only by personal contact or by collateral materials produced or approved by us."[21]
3. "Our independent distributors agree to abide by our strict policies and procedures designed to ensure our independent distributors will comply with legal requirements."[22]

---

[18] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quotation marks omitted).

[19] *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1339 n.8; *In re Gold Resource Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1292 n.1 (D. Colo. 2013).

[20] Docket No. 38, ¶ 111.

[21] *Id.* ¶ 112.

*b. Regarding international sales and distributor enrollment:*

4. "[O]ur policies and procedures for our independent distributors differ slightly in some countries due to the different legal requirements of each country in which we do business."[22]

5. "We have proactively taken steps to ensure that we are fully in compliance with this ever changing regulatory landscape."[23]

6. LifeVantage has "positioned [itself] to enter new international markets adapted to the ever changing regulatory landscape."[24]

7. "[W]e believe that we are the industry leader in terms of setting a standard for compliance."[25]

*c. Regarding LifeVantage's compliance department:*

8. "We have a compliance department that addresses violations of our independent distributors when they become known to us."[26]

9. "We monitor and systematically review alleged independent distributor misbehavior through our internal compliance department."[27]

10. "Our compliance department monitors the activities of our independent distributors as part of our effort to enforce our policies and procedures."[28]

*d. Sarbanes-Oxley Act Certifications*

11. Plaintiffs also challenge Jensen and Jaggi's certification of LifeVantage's 2015 10-K and four separate Quarterly Report 10-Qs, which stated that they had "[d]isclosed in this report any change in the registrant's internal control over financial reporting . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting," and had reported to auditors "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."[30]

---

[22] *Id.* ¶ 114.
[23] *Id.* ¶ 113.
[24] *Id.* ¶ 122.
[25] *Id.* ¶ 123.
[26] *Id.* ¶ 122.
[27] *Id.* ¶ 114.
[28] *Id.* ¶ 112.
[29] *Id.* ¶ 111.
[30] *Id.* ¶ 116.

These statements are specific, and Plaintiffs include the date they were made, the identity of the speaker, and the class of people to whom they were made. The Court therefore finds that the Complaint adequately identifies the challenged statements.

### 2. *Facts Supporting the Misleading Nature of the Statements*

15 U.S.C. § 78u–4(b)(1) requires a plaintiff to specify the reasons why each statement is misleading. Defendants claim that Plaintiffs did not observe or have personal knowledge of facts supporting their belief of falsity, and that the allegations must therefore be treated as information-and-belief pleading. Allegations made on information and belief trigger a statutory requirement that the complaint "state with particularity all facts on which that belief is formed."[31] Information and belief pleading regarding falsity is scrutinized under a six-factor test.[32]

Here, however, the majority of facts alleged in support of the misleading nature of the statements are taken from Defendants' admissions in LifeVantage's 2016 10-K form. Defendants argue that Plaintiffs did not observe the creation of the 10-K form or the investigation that preceded it, and therefore, any allegations regarding the Form's contents are made upon information and belief. However, statements drawn from official Company statements need not be construed as having been made on information and belief.[33] Even if these statements are construed as being made on information and belief, Plaintiffs have satisfied their burden.

---

[31] 15 U.S.C. § 78u–4(b)(1).

[32] *See Adams*, 340 F.3d at 1099 (setting out the six-factor analysis).

[33] *See Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1190 (10th Cir. 2003) (construing statements made in conference calls where plaintiffs did not participate as being made on information and belief, but not construing statements from official financial statements as information and belief pleading).

The admissions in the 2016 10-K contradict most of the challenged statements and create a factual basis supporting allegations that the earlier statements were misleading. The Court finds that Plaintiffs have pleaded the facts upon which their belief is based with sufficient particularity to satisfy the Private Securities Litigation Reform Act ("PSLRA"), with one exception. Plaintiffs have failed to plead any facts supporting the falsity of the statement that distributors should promote products only by "personal contact or by collateral materials produced or approved by [LifeVantage]."[34] Therefore, the second statement fails to pass scrutiny under the first prong of the PSLRA.

### 3. Materiality of the Statements

Next, Defendants argue that some of the challenged statements are immaterial. For purposes of a 10(b) claim, a statement or omission is only material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[35] An omitted fact must significantly alter the "total mix" of information made available.[36]

Defendants argue that no reasonable investor would rely on the challenged statements because they were "vague statements of corporate optimism."[37] Statements of "'corporate optimism' or 'mere puffing' are . . . generalized statements of optimism that are not capable of objective verification."[38] However, "statements cannot be dismissed as mere corporate

---

[34] Docket No. 38, ¶ 112.

[35] *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[36] *Id.*

[37] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

[38] *Id.*

optimism" if they "could have, and should have had, some basis in objective and verifiable fact."[39]

Here, most of the challenged statements were or should have been based in objective and verifiable fact. The first and third statements include a factual assertion that LifeVantage's "strict" policies and procedures were capable of producing compliance with international regulations if followed. The fourth and fifth statements are based on a factual assertion that LifeVantage had country-specific policies and procedures in place that could ensure full compliance with international law. The eighth, ninth, and tenth statements are based on factual assertions that LifeVantage had a compliance department that monitored and addressed distributor violations. While Plaintiffs do not dispute the existence of a compliance department, the Amended Complaint does allege that LifeVantage had inadequate controls related to the training, monitoring and oversight of personnel who managed international business operations, and that the compliance department was therefore incapable of detecting or addressing distributor violations.[40] These statements had, or should have had, some basis in objective fact, and are therefore material. In addition, the statements regarding the adequacy of policies and procedures and the competence of the compliance department are types of facts that would assume "actual significance in the deliberations of the reasonable shareholder."[41]

On the other hand, the sixth and seventh statements are inactionable statements of corporate optimism. The comments that the Company had "positioned [itself] to enter new international markets adapted to the ever changing regulatory landscape" and the stated belief

---

[39] *Id.* at 1123.
[40] Docket No. 38, ¶ 80.
[41] *See TSC Indus., Inc.*, 426 U.S. at 449.

that LifeVantage was "the industry leader in terms of setting a standard for compliance" are precisely the type of "puffing" that is incapable of verification, and therefore immaterial. In sum, the Court finds the challenged statements material, with the exception of the sixth and seventh statements.

B. SCIENTER

The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[42] This requirement, known as scienter, is an essential element and "consists of 'a mental state embracing intent to deceive, manipulate, or defraud, or recklessness.'"[43]

"Recklessness is 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"[44] Allegations of motive and opportunity may be important to an inference of fraudulent intent, "but are typically not sufficient in themselves to establish a 'strong inference' of scienter."[45] Other pleaded facts that bolster scienter may include divergence between internal reports and external statements, or disregard of the most current factual information before making statements.[46]

---

[42] 15 U.S.C. § 78u-4(b)(2)(A).

[43] *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236–37 (10th Cir. 2016) (quoting *Adams*, 340 F.3d at 1105).

[44] *Id.* at 1255 (quoting *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001)).

[45] *Fleming Cos.*, 264 F.3d at 1262.

[46] *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1345.

The Court does not consider scienter for the statements that were not adequately supported with the particularity required by the PSLRA.[47]  Therefore, the second, sixth, and seventh statements will not be considered here.  For the remainder of the statements, Plaintiffs must show an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[48]

To establish scienter, Plaintiffs rely on the following: (1) Defendants' knowledge of improper sales in the MLM industry and failure to impose stricter internal controls; (2) Defendants' motive and opportunity to conceal improper practices; (3) information from former employees; (4) LifeVantage's implementation of a recovery plan; and (5) false Sarbanes-Oxley Act ("SOX") certifications and knowledge of falsity under the "core operations" theory.

### 1. Improper sales in the MLM Industry and Failure to Implement More Rigorous Internal Controls

Plaintiffs allege that Defendants had to be "more aware of who is buying its products and where they are located than a typical consumer products company" due to the special risk of becoming a pyramid scheme.[49]  Plaintiffs argue that the improper practices at other MLM companies should have signaled to Defendants that the same things could be happening within LifeVantage, and that Defendants failure to implement adequate controls was therefore particularly glaring.

For example, prior to his employment with LifeVantage, Jensen was employed as Chief Sales Officer at Jeunesse Global, another MLM company.  In a lawsuit connected with that employment, Jensen stated that he had "learned of various business practices . . . which he

---

[47] *Pirraglia*, 339 F.3d at 1191.
[48] *Tellabs, Inc.*, 551 U.S. at 314.
[49] Docket No. 47, at 27.

believed to be unsavory, unethical, and perhaps even illegal.  Such practices and decisions included improper sales activities in certain specific foreign markets and attempting to sell products in foreign markets . . . without obtaining required legal authorizations to do so."[50]

Plaintiffs allege that despite Jensen's awareness of improper practices elsewhere in the industry, Jensen fostered an environment at LifeVantage where improper sales and distributor enrollment were rewarded, and at the same time failed to implement controls that could detect those improper sales.  Plaintiffs analogize this situation to *In re Veeco Instruments, Inc. Securities Litigation*, where a company dramatically downsized its accounting department, which "allegedly weakened . . . internal accounting controls and created and fostered an environment that permitted defendants to conceal accounting improprieties and false financial reporting."[51] There, the Southern District of New York stated that "a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."[52]

In two important respects, this case is unlike *Veeco Instruments*.  First, in *Veeco Instruments*, plaintiffs alleged that defendants had given specific instructions to engage in accounting manipulations that "suggest[ed] a conscious decision to improperly recognize revenue."[53]  There are no comparable allegations here.  Second, the Company in *Veeco Instruments* weakened accounting controls, which led directly to defendants' alleged ability to conceal fraud.  Here, there is a much more attenuated link between Jensen's strengthening of incentives for buying product and enrolling distributors and some distributors' misconduct.

---

[50] Docket No. 38, ¶ 129.
[51] 235 F.R.D. 220, 232 (S.D.N.Y. 2006).
[52] *Id.*
[53] *Id.* (quoting *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *20 (E.D.N.Y. Sept. 19, 2005) (unpublished)).

Plaintiffs admit that Defendants' incentives could result in inventory loading, something that might be indicative of a pyramid scheme, but not illegal on its own.

Plaintiffs urge the Court to conclude that it was an extreme departure from the standards of ordinary care for Defendants to fail to more closely monitor what distributors did with product purchased for personal use. However, the Complaint does not set out a standard of ordinary care in this situation. Moreover, there are few allegations concerning what Defendants knew about what was occurring at LifeVantage. Therefore, the mere fact that Defendant Jensen had worked in the industry before and did not do more to strengthen controls is not enough to show scienter.

### 2. *Motive and Opportunity*

Plaintiffs assert that Jensen and Jaggi were motivated to conceal improper practices to maintain an appearance of corporate profitability because their predecessors were forced to resign when revenue plateaued. While there is a general motive to maintain the appearance of corporate profitability that could be imputed to any publicly-owned corporation, there are instances where that motive is more concrete and serious.[54] Plaintiffs rely on *Pirraglia v. Novell, Inc.*, where:

> [the company] had fired its previous executive for failing to improve the company's revenue, and [company President] Marengi was eventually fired for the same reason. While the desire to protect one's own position is shared by all company executives, the defendants in the instant case had especial cause to think that they would lose their jobs if they failed to produce results, given the recent termination of [the company's President and CEO].[55]

In light of the massive shake-up that occurred among management after the Company's revenue plateaued in 2014, Defendants Jensen and Jaggi had special reason

---

[54] *See id.* at 230.
[55] *Pirraglia*, 339 F.3d at 1191 (internal citations omitted).

to fear termination if revenue did not trend upwards. Further, "as the executives in charge of the firm, they had control over its public statements and could influence the decisions of investors and analysts."[56] "While this evidence of motive and opportunity does not in itself establish a strong inference of scienter, we consider it in reviewing the 'totality of the pleadings.'"[57]

### 3. Information From Former Employees

Plaintiffs cite statements of former LifeVantage employees that distributors were purchasing product ostensibly for personal use, but in quantities too large to be used by a single person. LifeVantage's former Senior VP of Global Sales and Business Development alleged that in places like Hong Kong, 85–90% of the product shipped was resold in "non-open" markets.[58] The Managing Director of LifeVantage's Japan Business reported that distributors in East Asia, and even some top-level distributors in the US, regularly resold products in Asian countries where the products were not licensed. According to the former employee, this was how LifeVantage would "build up new markets."[59]

LifeVantage's Director of Recognition and Incentives from 2009 until February, 2016, stated that the new incentives put in place by Jensen were based not on a distributor's retail sales, but rather on their "organizational volume," defined as the amount of product consumed or sold by a distributor's downline organization.[60] Plaintiffs argue that this encouraged inventory

---

[56] *Id.*
[57] *Id.* (quoting *Fleming Cos.*, 264 F.3d at 1262).
[58] Docket No. 38, ¶ 71.
[59] *Id.* ¶ 72.
[60] *Id.* ¶ 66.

loading and the recruitment of distributors in countries where strict limitations were placed on LifeVantage's direct-selling structure.

The fact that some upper management may have known about improper sales practices raises concerns. Absent from the former employees' statements, however, is any allegation that supports an inference that the individual Defendants were made aware of improper distributor enrollments or sales during the class period. Without this link, these allegations do little to support a strong inference of scienter.

### 4. Implementation of a Recovery Plan

Plaintiffs argue that the termination of Jaggi only a year after he was hired and the Company's imposition of new restrictions on Jensen's incentive compensation provide additional evidence that the Company concluded internally that its management had acted improperly. Plaintiffs cite a case from the Southern District of New York where the termination and resignation of executives, in addition to a company's acknowledgement that certain transactions were unaligned with company policy, were factors that supported a finding of scienter.[61] In another case from the same court, a company's admission of material weakness, coupled with forced resignations, contributed to circumstantial evidence of fraud.[62]

In those cases, however, resignations were only one factor among others, including the Board of Directors' approval of transactions that were inconsistent with company policy,

---

[61] *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009).

[62] *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008). ("[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter.").

evidence showing a flow of information on the disputed issues from low level employees to senior officers on a daily basis, and repeated and knowing backdating of stock options.[63]

Here, Jaggi's employment was terminated on or around January 18, 2017, one month after the 2016 10-K was released and about 18 months after his hiring. Jensen's employment was not terminated, but Plaintiffs allege that the Company penalized Jensen by amending his employment agreement to strengthen nonsolicitation and noncompete restrictive covenants, to make clear that a Company incentive compensation clawback policy applied to Jensen's incentive compensation, and to waive certain cash incentive bonus awards.[64] Jaggi's short employment time and the modifications to Jensen's agreement may bolster an inference of fraud, but only if there are other facts suggesting that Defendants were reckless rather than negligent in failing to detect distributor misconduct or simply were not a good fit at the Company. There are no such allegations here.

### 5. False SOX Certifications and the Core Operations Theory

According to the Sarbanes–Oxley Act of 2002 ("SOX"), officers and accountants of a public company must execute certifications discussing the company's internal control systems and explaining the effectiveness of those controls.[65] These certifications accompany the company's Forms 10–K and 10–Q.[66] Plaintiffs allege that Defendants Jensen and Jaggi made actionable statements or omissions by providing false certifications for the Class Period. In LifeVantage's 2015 10-K and four separate Quarterly Report 10-Qs, Jensen and Jaggi indicated that, to the best of their knowledge, they had "[d]isclosed in this report any change in the

---

[63] *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d at 535; *Hall*, 580 F. Supp. 2d at 233.
[64] Docket No. 38, ¶ 105.
[65] *See* 15 U.S.C. § 7241(a)(4).
[66] *See* Pub. L. No. 107–204, 116 Stat. 745 (2002).

registrant's internal control over financial reporting . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting" and had reported to auditors "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."[67]

To be an actionable statement, it is not enough that SOX certifications were false—"defendants must also have had knowledge of that falsity."[68] Here, Plaintiffs argue that Defendants must have known of improper sales because the revenue related to those activities was significant. This inference of knowledge is known as the "core operations" theory.

The core operations theory may supply an inference of knowledge among senior executives when alleged misconduct occurs in an operation that is important to a company's bottom line, if plaintiffs also make detailed and specific allegations about management's exposure to factual information.[69]

Here, improper international transactions affected $17 million in sales in 2016—8% of the Company's total revenue and 100% of the company's revenue growth over the prior year. Assuming that international sales is an operation important to LifeVantage's bottom line, Plaintiffs have failed to plead detailed and specific allegations that Defendants Jensen and Jaggi were aware of information contradicting their SOX certifications.

---

[67] Docket No. 38, ¶ 116.
[68] *Hall*, 580 F. Supp. 2d at 232.
[69] *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 14-16814, 2017 WL 1753276, at *11 (9th Cir. May 5, 2017) (unpublished) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)); *In re Qwest Commc'ns Int'l, Inc*. 396 F. Supp. 2d 1178, 1206 (D. Colo. 2004) ("[A]n allegation that an individual defendant knew certain information based on that individual's position in a company, combined with other relevant allegations concerning knowledge or motive, can be sufficient to support a strong inference of scienter under the PSLRA.").

None of the former employees cited in the Complaint alleged how they came to discover improper sales, when, or who else knew about the practices. There is no allegation that information regarding improper practices was ever reported up the chain of command or that the CEO would have been made aware of the improper transactions in the usual course of business.

In addition, the transactions at issue here occurred on a much smaller scale than those in cases where the core operations theory has been applied. For example, in *Adams v. Kinder-Morgan, Inc.*, the Tenth Circuit found scienter where, among other things, profits arose from a single transaction that represented more than 25% of a company's quarterly income.[70] In *Adams*, the plaintiffs connected the transaction to the individual defendants by alleging that the CFO had been told that the company was losing money and would be unprofitable before he signed financial statements declaring otherwise, and that the company had made a decision to accelerate the recognition of income in contravention of GAAP and the company's accounting policies.[71]

The fact that the revenue related to the misconduct here was made up of relatively small transactions, rather than one large transaction, weakens the inference that senior management must have been aware of the details of the transactions. Whether or not Defendants should have done more to detect the improper sales, Plaintiffs have inadequately pleaded that Defendants knew that the SOX certifications were false at the time they signed them. The allegation that that Defendants were upper-level management is not sufficient to infer knowledge; the Tenth Circuit

---

[70] *Adams*, 340 F.3d at 1106.

[71] *Id.* at 1105–06.

has explained that, "standing alone, the fact that a defendant was a senior executive in a company cannot give rise to a strong inference of scienter."[72]

In conclusion, Plaintiffs have inadequately pleaded that Defendants knew information contradicting the reports at the time they certified them. Therefore, the certifications are not actionable statements and do not contribute to scienter.

### 6.  *Scienter as to the Individual Defendants*

There is some disagreement among the Circuits as to whether allegations of scienter can be imputed to all other defendants.[73] Although the Tenth Circuit has not addressed the issue, district courts within the Circuit have expressed hesitancy to accept group pleading on the issue of scienter.[74] In a thorough and persuasive opinion, the New Mexico District Court reasoned,

> While group pleading may still be permissible and useful when pleading conduct and omissions, the plaintiffs run a substantial risk when they rely on group pleading to show scienter. It may no longer be sufficient for plaintiffs to allege conduct or circumstances as to a group of individuals, and then to ask the Court to infer that the conduct evinces the necessary scienter as to all defendants in that group.[75]

The court went on to conclude that "the PSLRA demands that the facts giving rise to the necessary inference of scienter be pled with particularity as to each defendant."[76]

Considering all allegations relating to Jaggi, Plaintiffs have alleged that Jaggi was a senior executive at the Company, that improper sales practices occurred during his tenure, that he

---

[72] *Id.* at 1106.

[73] *See Tellabs, Inc*, 551 U.S. at 326 n.6 (recognizing disagreement); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 489 n.101 (S.D.N.Y. 2007) (noting that three circuits have found that group pleading was abrogated by the PSLRA). *Compare Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006) *with Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 364 (5th Cir. 2004).

[74] *See In re Thornburg Mortg. Sec. Litig.*, 695 F. Supp. 2d 1165, 1200 (D. N.M. 2010).

[75] *Id.*

[76] *Id.*

had a motive and opportunities to conceal those practices in order to enhance revenue, and that he was forced to resign shortly after improper practices came to light. These allegations certainly raise a possibility that Jaggi participated in concealing improper practices. However, there is not enough to give rise to a strong inference of scienter, or to create a narrative that is as cogent and compelling as an innocent inference that Jaggi was hired during a time of high turnover and unwittingly inherited problematic practices at LifeVantage. Therefore, Plaintiffs have failed to make out a claim against Defendant Jaggi under Section 10(b).

With regard to Jensen, Plaintiffs alleged that Jensen was aware of at least one other MLM firm that engaged in improper sales. Jensen had a motive and opportunity to conceal improper sales, and he introduced incentives that may have encouraged distributors to engage in improper practices. Further, Jensen failed to put in place controls that could detect the distributor misconduct, and the Company amended his contract shortly after the improper practices came to light.

These factors regarding scienter are more compelling than those related to Jaggi, and again, they raise a plausible story that Jensen either intentionally covered up improper practices or that Jensen was reckless in failing to learn about the practices. On the other hand, Plaintiffs have failed to set out what actions would have been typical for a CEO of an MLM company to take under the circumstances, and have failed to establish that Jensen's actions were a significant deviation from the norm. In addition, the inferential gap between the distributors' actions and Jensen's knowledge of such actions is large, and even with all allegations taken together, the innocent inference remains more compelling than an inference of scienter. For these reasons, Plaintiffs' Section 10(b) claim against Jensen is also inadequately pleaded.

## C. "CONTROLLING PERSON LIABILITY" UNDER SECTION 20(a)

Section 20(a) of the Securities Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.[77]

"To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."[78]

Here, Jensen was likely a "control person," as CEO of the Company with management authority for the corporation on a daily basis.[79] Jensen had direct control over Jaggi, his chief financial officer and an alleged primary violator of Rule 10b-5. However, because no primary violations by Jaggi were adequately pleaded, Plaintiffs' Section 20(a) claim must be dismissed.[80]

## IV. PLAINTIFFS' REQUEST FOR LEAVE TO AMEND

In the closing sentence of their opposition brief, Plaintiffs request leave to amend "to correct any perceived deficiencies."[81] However, "a bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be

---

[77] 15 U.S.C. § 78t(a).

[78] *Fleming Cos.*, 264 F.3d at 1270 (citing *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)).

[79] *See Adams*, 340 F.3d at 1108; *Maher*, 144 F.3d at 1305.

[80] *See Adams*, 340 F.3d at 1107–08.

[81] Docket No. 47, at 30.

based."[82]  The Court will allow Plaintiffs fourteen days to submit a formal motion to amend.  If

Plaintiffs fail to submit a motion, the Court will dismiss Plaintiffs' claims without prejudice.

It is therefore

ORDERED that Defendant's Motion to Dismiss for Failure to State a Claim (Docket No.

43) is GRANTED.  Plaintiffs may file a motion to amend within fourteen days.

DATED this 15th day of June, 2017.

BY THE COURT:

_____
Ted Stewart
United States District Judge

---

[82] *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014).