IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUN ZHANG, Individually and On behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFEVANTAGE CORPORATION, DARREN JAY JENSEN and MARK R. JAGGI,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED CLASS ACTION COMPLAINT<br><br><br>Case No. 2:16-CV-965 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiffs' Motion for Leave to File Second Amended Class Action Complaint. For the reasons discussed below, the Court will deny the Motion as Plaintiffs' proposed Second Amended Complaint fails to meet the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading requirements and filing the Complaint would be futile.

I. BACKGROUND

LifeVantage Corporation ("LifeVantage") is a network marketing company incorporated in Colorado and headquartered in Utah. LifeVantage sells dietary supplements, skin care products, energy drink mixes, pet supplements, and other products. LifeVantage sells products in the United States, Japan, Hong Kong, Australia, Canada, Philippines, Mexico, and Thailand.

Beginning in 2009, LifeVantage adopted a business model known as Multi-Level Marketing, or "MLM." Instead of selling its products in retail stores, LifeVantage relies on

1

"independent distributors"[1] to sell its products and to recruit additional distributors. MLMs are subject to regulatory constraints in most countries and are banned in others.

After adopting the MLM model, LifeVantage grew rapidly. The company's revenue roughly tripled annually for three consecutive years, surging from $4.14 million to $126.18 million. Revenue rose again in 2013 to $208.18 million before plateauing and beginning to decline in 2014.

On February 4, 2015, LifeVantage's Board stated that a new CEO was necessary because LifeVantage's growth was not progressing in line with its business model. Another reason the company gave for hiring a new CEO was to "successfully manage the complexities of international product distribution and finance."[2] In 2015, nearly all of LifeVantage's top management resigned, including the President and CEO, Chief Financial Officer, Chief Sales Officer, Chief Science Officer, and General Counsel. Around the same time, LifeVantage eliminated the position of General Counsel, appointed a new Chief Marketing Officer, and changed auditors.

In September 2015, LifeVantage's new CEO, Darren Jensen ("Jensen"), announced new initiatives to enhance the business. These included rewards for the recruitment of new distributors and incentives for newly enrolled distributors to purchase more product. Jensen also promoted global expansion by "targeting certain gateway markets which in turn opens up

---

[1] LifeVantage defines an independent distributor as someone who purchases LifeVantage products at wholesale prices and either resells it at retail prices or consumes it. An independent distributor can establish a "downline" by recruiting additional distributors and may earn a commission on the product purchased by those in the downline. *See* Docket No. 55 Ex. 1, ¶ 32.
[2] *Id.* ¶ 53.

2

opportunities in more and more markets."[3] On October 19, 2015, LifeVantage's stock prices fell below $1 and LifeVantage affected a 7:1 stock split in order to conform to NASDAQ trading requirements.

SEC rules require management to evaluate a company's internal controls and disclose every material weakness of which they are aware.[4] A material weakness is defined as "a deficiency, or a combination of deficiencies, in internal controls over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[5] In a 2015 10-K and in four 10-Q Forms, Defendants represented that LifeVantage's internal controls over financial reporting did not contain material weaknesses.[6] In various statements, Defendants touted the adequacy of LifeVantage's internal controls, distributor oversight, and LifeVantage's compliance department.

In 2016, LifeVantage employees raised concerns about LifeVantage's international policies, and an employee submitted a formal Sarbanes-Oxley ("SOX") complaint. In June 2016, the company initiated an independent audit and discovered several improper sales practices dating as far back as mid-2015. In connection with this news, the investigation, and subsequent remedial efforts, the market value of LifeVantage securities fell precipitously.

On January 27, 2017, Plaintiffs filed their First Amended Complaint ("FAC") against Jensen, CFO Mark Jaggi, and LifeVantage, claiming that Defendants violated sections 10(b) and

---

[3] *Id.* ¶ 69.
[4] *Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36639 (June 18, 2003).
[5] 17 C.F.R. § 240.12b-2.
[6] Docket No. 55 Ex. 1, ¶ 111.

20(a) of the Securities Exchange Act by making representations regarding the adequacy of LifeVantage's internal controls that were allegedly false and made recklessly or with the intent to mislead investors. The Court, in its Memorandum Decision and Order Granting Defendants' Motion to Dismiss ("the Order"),[7] filed June 15, 2017, found that Plaintiffs adequately pleaded the falsity and materiality of a number of Defendants' statements. However, the Court found that Plaintiffs failed to sufficiently plead facts giving rise to a strong inference that Defendants acted with scienter. Therefore, the Court granted Defendants' Motion to Dismiss, but allowed Plaintiffs to file a motion to amend. That Motion is now before the Court.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) dictates that "a party may amend its pleading only with the opposing party's written consent or the court's leave."[8] The Rule specifies that "[t]he court should freely give leave when justice so requires."[9] "The purpose of the Rule is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"[10]

The Court may refuse to grant leave to amend where it finds evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

---

[7] Docket No. 51.
[8] Fed. R. Civ. P. 15(a)(2).
[9] *Id.*
[10] *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)).

4

the amendment, [or] futility of amendment."[11] "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal."[12]

### III. DISCUSSION

Section 10(b) of the Securities Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[13] SEC Rule 10b-5 implements Section 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security."[14] Section 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation."[15]

"A plaintiff suing under section 10(b) . . . bears a heavy burden at the pleading stage."[16] To properly state a claim for securities fraud, a complaint must allege facts supporting the following:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.[17]

---

[11] *Foman v. Davis*, 371 U.S. 178, 182 (1962).
[12] *Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1288 (10th Cir. 2008) (quoting *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007)).
[13] 15 U.S.C. § 78j(b).
[14] 17 C.F.R. § 240.10b-5(b).
[15] *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quoting *Tellabs, Inc. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)).
[16] *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012).
[17] *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

Federal securities fraud claims are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b), which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[18] The Tenth Circuit requires a plaintiff pleading fraud to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[19]

In an effort to meet the heightened pleading requirements, Plaintiffs' proposed Second Amended Complaint ("SAC") re-alleges the facts contained in the FAC and adds: (1) information alleging a standard of ordinary care which Jensen allegedly deviated from; (2) statements from two more former LifeVantage employees which detail an improper sales scheme in Thailand and allege that Jensen was informed of the scheme as early as January 2016; and (3) more information regarding LifeVantage's financial history and public statements. The SAC also extends the class period to May 10, 2017, five months beyond the class period set out in the FAC.[20]

The SAC does not include additional information affecting the three challenged statements in the FAC that were found to be immaterial or lacked facts supporting falsity. Further, allegations regarding Defendants' motive and opportunity, LifeVantage's imposition of new restrictions on Jensen's incentive compensation, the allegedly false SOX certifications, and the application of the core operations theory remain essentially the same in the SAC. Therefore, the Court will assign the same weight to those allegations as provided in the Order and will focus

---

[18] Fed. R. Civ. P. 9(b).
[19] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)) (quotation marks omitted).
[20] Because Plaintiffs' Motion is denied, the Court will not address the arguments regarding the extended class period.

its discussion on whether the standard of ordinary care and former employee statements in the SAC create a strong inference of scienter.

The PSLRA states that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[21] This requirement, known as scienter, is an essential element and "consists of 'a mental state embracing intent to deceive, manipulate, or defraud, or recklessness.'"[22] "Recklessness is 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"[23]

To make this determination, "courts must look to the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent."[24]

> [W]e may recognize the possibility of negative inferences that may be drawn against the plaintiff . . . not in a preclusive manner, but in an evaluative manner. That is to say, we consider the inference suggested by the plaintiff while acknowledging other possible inferences, and determine whether plaintiff's suggested inference is 'strong' in light of its overall context.[25]

Plaintiffs must show an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[26]

---

[21] 15 U.S.C. § 78u-4(b)(2)(A).
[22] *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236–37 (10th Cir. 2016) (quoting *Adams*, 340 F.3d at 1105).
[23] *Id.* at 1255 (quoting *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001)).
[24] *Fleming Cos.*, 264 F.3d at 1262.
[25] *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 (10th Cir. 2003).
[26] *Tellabs, Inc.*, 551 U.S. at 314.

1. *Standard of Ordinary Care*

In the FAC, Plaintiffs failed to provide the standard of ordinary care Defendants were held to and instead relied on statements from former LifeVantage employees to allege Defendants' deviating acts. These statements alleged that distributors purchased product ostensibly for personal use, but in quantities too large to be used by a single person. Plaintiffs concluded that Defendants' failure to more closely monitor product purchased for personal use and failure to enact adequate internal controls was an extreme departure from the standards of ordinary care. The Court found, however, that the FAC did not set out a standard of ordinary care for the situation. Moreover, there were few allegations concerning what Defendants knew about the improper sales and material weaknesses in LifeVantage's internal controls. Therefore, the mere fact that Jensen worked in the industry before and did not strengthen controls at LifeVantage was not enough to show scienter.

The SAC renews those allegations and adds that in the 2015 and 2016 10-Ks, Jensen assured investors that LifeVantage was a member of the United States Direct Selling Association ("DSA") and therefore subject to the ethical business practices and consumer service standards required by DSA's Code of Ethics.[27] The DSA Code of Ethics addresses, among other things, inventory loading:

> A member company shall not require or encourage an independent salesperson to purchase inventory in an amount which unreasonably exceeds that which can be expected to be resold and/or consumed by the independent salesperson within a reasonable period of time. Member companies shall take clear and reasonable steps to ensure that independent salespeople are consuming, using or reselling the products and services purchased.[28]

---

[27] Direct Selling Association, *Code of Ethics* (June 2017), http://www.dsa.org/docs/default-source/Code-of-Ethics/dsa_coereport_june2017.pdf?sfvrsn=2.
[28] *Id.* at 11.

8

DSA member companies are also required to "provide adequate training to enable independent salespeople to operate ethically," and to "prohibit their independent salespeople from marketing or requiring the purchase by others of any materials that are inconsistent with the member company's policies and procedures."[29] Finally, when a complaint is made that an

> independent salesperson . . . of a member company has engaged in any improper course of conduct pertaining to the sales presentation of its goods or services, the member company shall promptly investigate the complaint and shall take such steps as it may find appropriate and necessary under the circumstances to cause the redress of any wrongs that its investigation discloses to have been committed.[30]

In addition to the DSA Code of Ethics, SEC regulations require certain internal controls.[31] The internal controls designed by management must "[p]rovide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements."[32]

Plaintiffs allege that Jensen, as CEO, was responsible for following these standards, but failed because (1) LifeVantage did not have documented, country-specific policies for distributor enrollment requirements, distributor payment and collection policies, and shipping, order fulfillment, and customs import policies; (2) there were inadequate controls over certain international practices, including a lack of training monitoring and oversight of personnel who were involved in or managed its international business operations; and (3) Jensen instituted

---

[29] *Id*. at 12.
[30] *Id*. at 13.
[31] 17 C.F.R. § 240.13a-15(f).
[32] *Id.* at § 13a-15(f)(3). Plaintiffs also quote a 1992 publication of *Internal Control-Integrated Framework*, which was written by the Committee of Sponsoring Organizations of the Treadway Commission. While this framework may provide guidance on internal controls and may be used by public companies, Plaintiffs have not offered evidence that it sets the industry standard of ordinary care or that Jensen should have abided by its standards. Therefore, it is not considered here.

bonus pools and other incentives which encouraged purchasing of inventory beyond what an individual could sell or use.

Despite these alleged issues, Jensen assured investors on January 12, 2016, and February 12, 2016, that he was aware of the evolving regulatory environment within direct selling and that the company had "proactively taken steps" to ensure that they were fully in compliance with this ever changing regulatory landscape.[33] Plaintiffs claim that deficiencies were an extreme departure from the standard of ordinary care. Defendants' response argues that Jensen complied with the standard of ordinary care and, only months after allegedly learning of inadequate internal controls and improper sales practices, initiated an independent investigation.[34]

The allegations do suggest that Jensen, at some level, deviated from the standards of ordinary care by providing incentives that encouraged inventory loading, failing to make sure LifeVantage's internal controls were adequate for the international expansion the company was attempting to accomplish, and assuring investors that controls were in place. These allegations provide some support for an inference of scienter. However, the Thailand scheme, discussed below, began before Jensen announced the initiatives that allegedly encouraged inventory loading. This, combined with the mere fact that Jensen did not strengthen controls within his first few months as CEO, is not enough to show extreme deviation from the standard of ordinary care. Further, when Jensen allegedly discovered the improper sales practices, he followed the standard of care and initiated an internal investigation into the complaints. Therefore, Plaintiffs' allegations may support a finding that Jensen deviated from the standard of ordinary care, but the

---

[33] Docket No. 55 Ex. 1, ¶ 102.
[34] Docket No. 56, at 13–14.

Court finds that any deviations that occurred did not rise to the level of extreme deviations and are insufficient to independently support a strong inference of scienter.

   2. *Former Employees*

The FAC included statements from former LifeVantage employees which Plaintiffs used to support allegations that Jensen put policies in place that encouraged inventory loading and improper sales practices. The Court found that, while some upper management may have known about improper sales practices, the former employees' statements did not include any allegation that supported an inference that Jensen was made aware of improper distributor enrollments or sales during the class period. Without this link, the FAC did little to support a strong inference of scienter.

The SAC contains the same statements from the first four former employees and adds statements from two other former employees, Former Employee 5 ("FE5") and Former Employee 6 ("FE6"), detailing an illegal sales scheme that allegedly occurred in Thailand. FE5:

> served as Director of Supply Chains from February 2009 to March 2017. He managed approximately nine people in three departments: inventory, logistics, and purchasing. He oversaw 10 markets for the Company and performed quality control audits in the United States, Japan, and India. He reported to COO Robert Urban until Urban's termination in December 2016, and then to Gordon Fralick, interim Director of Quality Assurance and VP of Product Management.[35]

FE6 worked at LifeVantage from March 2009 to February 2016, first as Director of Marketing, then Director of Sales, then Director of Events.[36]

FE5 claims that his inventory team uncovered an illegal sales scheme in Thailand which he says began "as early as mid-2015[.]"[37] The scheme involved "some U.S. distributors [who]

---
[35] Docket No. 55 Ex. 1, ¶ 27.
[36] *Id.* ¶ 28.

began smuggling the Company's flagship nutritional supplement, Protandim Nrf2 Synergizer, into Thailand" before it was licensed for sale there.[38] According to FE5, "call center agents in Thailand were only able to place orders with U.S.-based distributors because . . . LifeVantage's managing director for Thailand gave them the necessary access to the company's proprietary computer system."[39] That individual could only gain access to the proprietary computer system with the help of higher ranking LifeVantage employees. LifeVanatage's managing director for Thailand was allegedly given access because management was trying to increase LifeVantage's presence in Thailand by introducing Protandim as a way to boost sales and encourage impatient distributors to stay with the company.[40]

When FE5 and his team discovered the scheme, he claims that he raised the issue directly with COO Robert Urban and then raised the issue again with the VP of Taxation, Michael Seeley, as early as January 2016 and continued to do so every time a US distributor tried to pick up a large quantity of Protandim. According to FE5, "Urban told [FE5] that Seeley had told Jaggi (and probably Jensen as well) about improper sales practices as early as January 2016."[41] FE6 provides some statements which corroborate the existence of this improper sales scheme in Thailand and states who the likely architects of the scheme were.

Plaintiffs conclude from this that, "[i]n light of the fact that CFO Jaggi, COO Robert Urban, and VP of Taxation Michael Seeley all learned about the improper sales practices by

---

[37] *Id.* ¶ 78.
[38] *Id.*
[39] *Id.* ¶ 85.
[40] Plaintiffs include statements from FE5 regarding LifeVantage's problems with high inventory, alleging that these problems were motive for management to unload product illegally in Thailand. These issues were just arising in the second and third quarters of 2016, a year after the Thailand scheme allegedly began and around the same time Jensen initiated the investigation.
[41] Docket No. 55 Ex. 1, ¶ 87.

January 2016, Jensen must also have learned about them in January 2016 or shortly thereafter."[42] Jensen initiated an internal investigation soon after FE5's team reported similar schemes in Hong Kong and Mexico.

Defendants argue that, "Even taking plaintiffs' new double hearsay speculation as true, the proposed SAC still would only allege that Jensen was told about some improper sales practices in late January 2016, that improper sales practices were discovered in greater numbers in May 2016 and that the Company (with Jensen at its head) stopped the improper sales practices and began an internal investigation into them just a month later, in June 2016."[43] Defendants also argue that the inferential gap between the distributors' actions and Jensen's knowledge still remains and that the statement, "Jensen probably knew" fails to close that gap. Defendants also point out that courts routinely hold that speculation and hearsay allegations attributed to unnamed sources do not suffice to give rise to a strong inference of scienter.[44]

Plaintiffs address Defendants' hearsay concerns by citing to *Adams v. Kinder Morgan Inc.*, arguing that "The PSLRA requires plaintiffs to allege facts with particularity; it does not

---

[42] *Id.* ¶ 88.
[43] Docket No. 56, at 3.
[44] *See e.g. Kapur v. USANA Health Sciences, Inc.*, 2008 WL 2901705, at *16 (D. Utah July 23, 2008) ("[S]ole reliance on a conclusory statement, notably based on hearsay, of a confidential witness is insufficient to satisfy the PSLRA particularity requirement."); *See also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009) ("[T]he rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence. However, a hearsay statement, while not automatically precluded from consideration to support allegations of scienter, may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration …."(internal quotation marks removed)); *Gammel v. Hewlett Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012) ("Further, while reliance on hearsay does not automatically render confidential witness statements unreliable, such reliance may indicate that particular statements are 'not sufficiently reliable, plausible, or coherent to warrant … consideration.'") (quoting *Zucco Partners*, 552 F.3d at 998).

require plaintiffs to '[p]lead their evidence in their complaint . . . .'"[45] While this is true, the court in *Adams* goes on to state:

> In pleading the misleading nature of a defendant's statements, the support provided by source information will often be helpful in distinguishing whether a particular allegation is mere rumor and speculation or whether it is based on concrete information from relevant documents or people who were in a position to know the truth of the allegations.[46]

Plaintiffs are correct that the PSLRA does not require evidence to be pleaded in the complaint. However, allegations based solely on hearsay and speculation lose strength as the levels of hearsay and speculation grow. In this case, FE5 is sufficiently identified in the SAC as a person who would be in the position to know the truth of the alleged statements. It is also plausible that he would have relayed this information up the chain of command. The issue here is whether the statement that "Urban told [FE5] that Seeley had told Jaggi (and probably Jensen as well)"[47] closes the large inferential gap between the distributors' actions and Jensen's knowledge of such actions. Two Tenth Circuit cases aid in determining this issue.

First, in *Adams*, the complaint provided detailed statements alleging that the CFO was informed of and knew about the facts which gave rise to the false statements in the financial reports he signed.[48] The *Adams* court held that "[t]he fact that [the CFO] knew of the false statements [was] an important link in the inferential chain between Hall's position as president and chief executive officer and the conclusion that Hall knew of the false statements."[49] This, combined with the fact that Hall was the CEO–a relevant fact in the totality, but not strong by

---

[45] Docket No. 57, at 4 (quoting *Adams*, 340 F.3d at 1101).
[46] *Adams*, 340 F.3d at 1102.
[47] Docket No. 55 Ex. 1, ¶ 87.
[48] *Adams*, 340 F.3d at 1106. By signing the reports the CFO was saying that the plant in question was profitable when he knew that it was not. *Id*.
[49] *Id.*

itself–and the magnitude of the alleged falsity,[50] resulted in the court holding that the plaintiffs met the pleading requirements for scienter in regards to the CEO Hall.[51]

In the second case, *Wolfe v. Aspenbio Pharma, Inc.*,[52] the plaintiffs relied on two allegations: (1) that the defendant was the CEO; and (2) that the company's former CEO told the defendant a year and a half before problems arose that the project in question "just wasn't working." The *Wolfe* court held this statement to be "so vague and global as to be unhelpful as a benchmark for scienter."[53] "[I]t would eviscerate the heightened PSLRA pleading standard to find this mere *possibility* satisfies the requirement that a plaintiff 'state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'"[54] "We have previously held that allegations of scienter are insufficient when the complaint requires the court to 'stack inference upon inference to even conclude that the statements were false—much less that defendants knew or were reckless in not knowing they were false.'"[55]

The *Wolfe* court distinguished its ruling from *Adams*, holding:

> The information provided to the *Adams* defendant—who served as the chief financial officer of the company—about the profitability of a company enterprise was virtually the obverse of what the defendant subsequently stated to be true, giving rise to "a strong inference that [the defendant] acted with intent to deceive." In the present case, in order to conclude that Mr. Donnelly actually knew that the challenged statements were false, and thus possessed the requisite scienter, one would need to make a series of inferences that were unnecessary in *Adams*.[56]

---

[50] False claims accounted for a quarter of the company's net income that quarter, an amount sufficient for a reasonable inference that the CEO would know of the truth or falsity of the amount.
[51] *See id.*
[52] 587 F. App'x 493 (10th Cir. 2014) (unpublished decision).
[53] *Id.* at 498.
[54] *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)).
[55] *Id.* (quoting *Level 3 Commc'ns, Inc.*, 667 F.3d at 1345).
[56] *Id.* (quoting *Adams*, 340 F.3d at 1105).

The facts in the present case fall between the weak inference of scienter in *Wolfe* and the very strong inference of scienter in *Adams*. On the one hand, FE5 allegedly reported the Thailand scheme to LifeVantage's COO Robert Urban and VP of Taxation Michael Seeley. Based on this, it is possible that, as part of upper management, Seeley did inform CFO Jaggi. If Jaggi did know about the issues FE5 reported, that fact could be seen as an important link in the inferential chain between Jensen's position as CEO and the conclusion that Jensen knew of the false statements.

However, in *Adams*, there were specific, detailed allegations regarding the CFO's knowledge of the false statements and his specific attempts to mislead. In this case, the only statement alleging CFO Jaggi's knowledge is that Robert Urban told FE5 that Micheal Seeley told CFO Jaggi. Even then, in order to close the gap between the discovery of the illegal sales scheme by FE5 and Jensen's knowledge of the scheme, another inferential step must be made; a step which Plaintiffs attempt to make with the statement: "probably Jensen as well."[57] The number of inferential steps and the amount of speculation required to connect Jensen's knowledge to the illegal sales scheme and inherent internal control problems makes this case more similar to *Wolfe* than to *Adams*. Plaintiffs' allegations require a series of inferences that were unnecessary in *Adams* and the Court must "stack inference upon inference."[58] While FE5's statement is not "so vague and global as to be unhelpful as a benchmark for scienter,"[59] the amount of inference required to close the gap weakens the inference of scienter. The Court

---

[57] Docket No. 55 Ex.1, ¶ 87.
[58] *Wolfe*, 587 F. App'x at 498 (quoting *Level 3 Commc'ns, Inc.*, 667 F.3d at 1345).
[59] *Id.*

finds, therefore, that the statements from LifeVantage's former employees are not enough to establish a strong inference of scienter.

### 3. *Totality of the Pleadings*

"'[W]hether an inference is a strong one cannot be decided in a vacuum;' therefore we look to the totality of the pleadings to determine whether the plaintiff's suggested inference is strong enough to adequately plead scienter under the Reform Act."[60] In reviewing the totality of the pleadings, the Court considers Plaintiffs' previous allegations regarding (1) motive and opportunity; (2) LifeVantage's imposition of new restrictions on Jensen's incentive compensation; (3) the allegedly false SOX certifications; (4) Jensen's position as CEO; and (5) the assertion of the core operation's theory. The Court also considers Plaintiffs' additional allegations regarding Jensen's alleged deviation from the DSA Code of Ethics and the statements made by FE5 and FE6.

Plaintiffs' allegations in the SAC create a plausible inference that Jensen either intentionally covered up improper practices or that Jensen was reckless in failing to learn about the practices. Jensen had motive and opportunity to make misleading statements in light of the recent "massive shake-ups" among LifeVantage management, and the timing of the restrictions on Jensen's compensation coincided with the finding of improper sales practices. Additionally, Jensen, who had prior knowledge of the pitfalls MLM companies face and who assured investors that LifeVantage was a DSA member company, put in place initiatives which encouraged inventory loading and simultaneously pushed for increased international expansion. Finally, Jensen was the CEO of LifeVantage, and it is plausible that FE5's discovery of the Thailand

---

[60] *Caprin v. Simon Transp. Servs, Inc.*, 99 F. Appx. 150, 159 (10th Cir. 2004) (unpublished decision) (quoting *Pirraglia*, 339 F.3d at 1187).

scheme was reported up the chain of command to CFO Jaggi and then to Jensen. All of these allegations, taken as a whole, create a reasonable inference of scienter.

However, Plaintiffs must show an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[61] In determining whether it is compelling, the Court "may recognize the possibility of negative inferences that may be drawn against the plaintiff."[62]

At the time Jensen became CEO, LifeVantage's stocks were already on a downward trajectory. A large portion of senior management was replaced and the illegal sales scheme in Thailand that FE5 discovered was already beginning. In those initial months as the new CEO, Jensen assured investors that there were no material weaknesses in LifeVantage's internal controls, but Plaintiffs do not allege that Jensen personally knew of improper sales practices and weak internal controls until January 2016 at the earliest. Even this is in question since FE5's statement that Jensen was probably informed of the issues requires the Court to stack several inferences on top of each other.

Regardless of whether Jensen did find out about the improper sales practices as FE5 alleges, Plaintiffs provided only one valid challenged statement made by Jensen after January 2016. This statement, from a conference call in February 2016, stated that LifeVantage had "proactively taken steps" to ensure full compliance with a changing regulatory landscape.[63] Plaintiffs also provide LifeVantage's 2016 10-K in which Jensen disclosed that there were internal control deficiencies that rose to the level of "a material weakness in our internal controls

---

[61] *Tellabs, Inc.*, 551 U.S. at 314.
[62] *Pirraglia*, 339 F.3d at 1187.
[63] Docket No. 55 Ex. 1, ¶ 179.

18

over financial reporting," and that LifeVantage uncovered several improper sales practices.[64] Jensen also detailed in the 2016 10-K the steps the company was taking to remedy the issues.

These statements and facts create the innocent inference that Jensen took over as CEO at a time when the problems with internal controls, illegal sales schemes, high turnover among senior management, and falling stock prices already existed. Jensen did not know about the internal control problems or improper sales practices at first, but when he was informed of these issues, he took steps to investigate and correct the problems and he informed LifeVantage's investors.

For these reasons, the Court finds that the innocent inference remains more compelling than any competing inference and the SAC fails to meet the heightened pleadings requirements of the PSLRA. Therefore, since the SAC would be subject to dismissal if filed, granting a motion to amend the SAC would be futile.

## IV. CONCLUSION

It is therefore

ORDERED that Plaintiffs' Motion for Leave to File Second Amended Class Action Complaint (Docket No. 54) is DENIED.

DATED this 18th day of September, 2017.

BY THE COURT:

Ted Stewart
United States District Judge

---

[64] *Id.* ¶ 111.